IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RAYMOND V. HANLEY, *et al.*,

    *Plaintiffs*,

    v.

DOCTORS EXPRESS FRANCHISING,
LLC, *et al.*,

    *Defendants*.

Civil Action No. ELH-12-795

## MEMORANDUM OPINION

Raymond V. Hanley, Marsha E. Hanley, and Hanley Limited Partners, LLC (collectively, the "Hanleys"), plaintiffs, filed suit against Doctors Express Franchising, LLC and its members, Peter Ross, Anthony J. Bonacuse, and Scott Burger (collectively, "Doctors Express"), as well as Rhino 7 Consulting Company ("Rhino"), defendants.[1] Doctors Express is a franchisor of urgent care medical center businesses under the "Doctors Express" or "DRX" brand, and Rhino is a franchise broker that was Doctors Express's agent in marketing DRX franchises.[2] The Hanleys assert that, as a result of defendants' misrepresentations in connection with the Hanleys' establishment of a DRX franchise, defendants are liable under Maryland statutory and common law. *See* Complaint ¶¶ 85, 94-95, 98 (ECF 1).[3]

---

[1] Plaintiffs also sued 25 "John Doe" defendants, who they state are "individuals or entities whose identities are currently unknown to the plaintiffs, but who plaintiffs allege on information and belief are jointly and severally liable to the plaintiffs with" the named defendants. Complaint ¶ 6. The Complaint does not make further mention of the Doe defendants or the basis of any claim that would give rise to their liability. In any event, the Doe defendants are not relevant to the issues discussed in this Opinion.

[2] For clarity, I use the term "Doctors Express" to refer to the defendant business entity and its members, and the term "DRX" to refer to the branded urgent care center franchises sold by Doctors Express.

[3] The suit is premised on diversity jurisdiction under 28 U.S.C. § 1332(a). The alleged damages exceed $75,000. Mr. and Ms. Hanley are domiciled in Missouri and are the members

In particular, the Hanleys advance three counts against all of the defendants.  Count I alleges violations of the Maryland Franchise Registration and Disclosure Law ("Maryland Franchise Law"), Md. Code (2010 Repl. Vol., 2012 Supp.), §§ 14-201 *et seq.* of the Business Regulation Article ("B.R.").  Count II asserts a common law action for fraud.  Count III alleges common law constructive fraud.  Plaintiffs seek more than $1.3 million in damages and rescission of their franchise agreement with Doctors Express.  *See* Complaint at 32.

Rhino has filed a motion to dismiss for failure to state a claim ("Rhino Motion") (ECF 12), pursuant to Fed. R. Civ. P. 12(b)(6).  Doctors Express has also moved to dismiss under Rule 12(b)(6) or, alternatively, for summary judgment under Rule 56 ("DRX Motion") (ECF 13 & 13-1).  The Hanleys filed a combined Opposition (ECF 17) to both motions, and Doctors Express and Rhino each filed a reply (respectively, "DRX Reply" and "Rhino Reply") (ECF 19 & 20).  No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons set forth below, I will deny both motions with respect to Count I (Maryland Franchise Law), except as to one alleged statutory violation.  I will grant both motions with respect to Count III (Constructive Fraud).  As to Count II (Fraud), I will deny the DRX Motion and grant the Rhino Motion.

## Background[4]

Since approximately September 2008, Doctors Express has sold franchises for management of urgent care medical centers.  *See id.* ¶ 9.  According to plaintiffs, Doctors

---

of Hanley Limited Partners, LLC.  *See* Complaint ¶¶ 1-2.  Therefore, all of the plaintiffs are citizens of Missouri.  Ross, Bonacuse, and Burger are not Missouri citizens, and are the sole members of Doctors Express Franchising, LLC, which is a Florida limited liability company (LLC).  At the time of the sale of the franchise in issue, they were also the sole members of the LLC's prior incarnation, as a Maryland LLC of the same name.  *See* Complaint ¶ 4.  Rhino is a North Carolina corporation with its principal place of business in North Carolina.  *See* Complaint ¶ 5.  In the franchise agreement at issue, the parties specified the District of Maryland as the forum for resolution of their disputes.  *See* Complaint ¶ 8 (citing § 17.7 of the franchise agreement).

[4] Unless otherwise noted, the facts set forth in this section are drawn from the Complaint.

Express markets its DRX franchises to non-medical professionals. *Id.* Plaintiffs claim that Doctors Express promises to provide its franchisees with "substantial and on-going expert support in the operation of urgent care medical centers including (but not limited to) physician credentialing, third-party payer contracting, medical billing, and providing equipment and discounted prices." *Id.*

In January 2010, Mr. Hanley began to explore opportunities to purchase an urgent care medical center franchise. *See* Complaint ¶ 11. On January 25, 2010, Douglas Schadle of Rhino contacted Mr. Hanley on behalf of Doctors Express. *Id.* The next day, Mr. Schadle emailed to Mr. Hanley a copy of Doctors Express's "Franchise Disclosure Document," along with an "Urgent Care Benchmarking Study," which described, among other things, the average number of patients treated per day at urgent care medical centers and the average revenue per patient. *Id.*

A "Franchise Disclosure Document," or "FDD," is a document containing certain specified disclosures that a franchisor must furnish to a prospective franchisee in connection with the offer or sale of a franchise to be located in the United States, under regulations issued by the Federal Trade Commission ("FTC"). *See* 16 C.F.R. § 436.2 (stating obligation to furnish FDD); *see generally* 16 C.F.R. part 436 (the "Franchise Rule").[5] The Franchise Rule permits individual states and local governments to enact regulations of franchise practices that "afford[ ] prospective franchisees equal or greater protection" than the federal Franchise Rule, "such as registration of disclosure documents or more extensive disclosures." 16 C.F.R. § 436.10(b). Maryland has enacted such provisions, by way of the Maryland Franchise Law.

---

[5] The Franchise Rule was promulgated by the FTC in the exercise of its authority, under the Federal Trade Commission Act, 15 U.S.C. §§ 41 *et seq.*, to issue rules defining and prohibiting "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." *Id.* § 45(a)(1); *see id.* § 45(m) (setting forth FTC's interpretive and enforcement authority).

According to plaintiffs, the version of Doctors Express's FDD that Mr. Schadle emailed to Mr. Hanley was the FDD that Doctors Express had filed with the California Commissioner of Corporations on or about May 21, 2009, pursuant to California franchise law.  As an exhibit to the DRX Motion, Doctors Express has submitted a copy of this version of the FDD, dated May 15, 2009.  *See* "FDD" or "2009 FDD," Ex.A to DRX Motion (ECF 13-2 at 1).[6]

The FDD contemplated establishment by a franchisee of a "DRX Management Business" to manage an urgent care medical center under the "Doctors Express" brand and marks, utilizing a management system developed by Doctors Express.  FDD at 2.  Because the DRX franchises were not necessarily marketed to medical professionals, the FDD contemplated that medical care at a DRX center ordinarily would not be provided by the franchisee, but rather would be provided by physicians, nurses, and medical technicians employed by a separate professional corporation or similar entity ("PC"), with which the franchisee would enter into a management agreement.  *Id.* at 2-4.  The franchised DRX Management Business consisted of providing a PC with management and administrative services and support, including leasing the physical plant of the urgent care center, purchasing or leasing necessary medical equipment and supplies, advertising, acquisition of permits and certifications, and billing of patients and health insurance providers.  *Id.*

From January through March 2010, Mr. Schadle emailed to Mr. Hanley links to Doctors Express's marketing materials.  The materials described how to open a DRX franchise and purportedly promised that Doctors Express would provide expertise "so that franchisees would acquire a 'turn-key' operation."  Complaint ¶ 12.

---

[6] The Hanleys submitted with their Opposition a later version of Doctors Express's FDD, dated April 6, 2010.  *See* "2010 FDD," Ex.1 to Opposition (ECF 17-1).  As I will explain, I need only consider the 2009 FDD submitted by Doctors Express at this juncture.  Except where clarity requires otherwise, I refer to the 2009 FDD as "the FDD."

On January 28, 2010, via email, Mr. Hanley asked Mr. Schadle to refer him to a Small Business Administration lender that could finance Mr. Hanley's potential DRX franchise.  *See* Complaint ¶ 13.  On January 29, 2010, via email, Mr. Schadle referred Mr. Hanley to "First Financial," a Florida lending institution apparently affiliated with Doctors Express.  *See id.* ¶ 13. A representative of First Financial emailed a document to Mr. Hanley on March 25, 2010, titled "Doctor's [sic] Express Financial Data and Operating Assumptions" ("DRX Business Model"). *See* Complaint ¶ 15.[7]  Plaintiffs contend, on information and belief, that the DRX Business Model was prepared by Doctors Express or was developed from information provided by Doctors Express.  *Id.*  The DRX Business Model contained estimates of income, expenses, and patient volume for the first two years of operation of a DRX franchise.  *See id.*  During a telephone conversation, Cindy Watson, a Vice President of First Financial, told Mr. Hanley that the DRX Business Model accurately portrayed a typical DRX franchise's performance.  *See id.*

Plaintiffs assert that, upon review of the DRX Business Model, Mr. and Ms. Hanley "concluded that the financial information in the model was consistent with, and in some ways more favorable than," the financial performance statements contained in the FDD, "including, in particular, that per patient revenues would be $125 and that the center would receive substantial operating revenues starting with its first month of operation."  *Id.*  The DRX Business Model was also consistent with Doctors Express's internet marketing materials, which stated that DRX franchises usually received payment for insurance claims in about fourteen days.  *See id.* Accordingly, "[i]n reliance upon the statements and representations made in the [FDD] and marketing materials, as well as materials, statements and representations communicated to them orally and in writing by Rhino [ ], First Financial, and other representatives" of Doctors Express,

---

[7] Plaintiffs have not identified the representative of First Financial who emailed the DRX Business Model to Mr. Hanley.  Nor does the record contain a copy of the DRX Business Model. In any event, neither First Financial nor any of its employees is a party to this case.

Mr. and Ms. Hanley decided to purchase a DRX franchise unit from Doctors Express, and form a new business entity for that purpose. *Id.* ¶ 16.

On or about March 26, 2010, Mr. Hanley, acting on behalf of Hanley Limited Partners, LLC, sent to Doctors Express a signed "Franchise Agreement" for the development of a DRX urgent care center in Missouri, at an exact location to be determined. *See id.* ¶ 17.   On or about March 29, 2010, Mr. and Ms. Hanley established Hanley Limited Partners, LLC as a Missouri limited liability company. *See id.* ¶ 18.  Doctors Express countersigned the Franchise Agreement on March 31, 2010.  *Id.* ¶ 17.  As an exhibit to the DRX Motion, Doctors Express submitted a copy of the executed Franchise Agreement.  *See* Franchise Agreement, Ex.B to DRX Motion (ECF 13-2 at 53).[8]

On April 22, 2010, the Hanleys sent to Doctors Express a business plan for their proposed franchise, based on a business plan template made available to franchisees on a private intranet website operated by Doctors Express. Complaint ¶ 19.[9] According to plaintiffs, the template was "consistent with the financial information disclosed in the FDD and the [DRX] [B]usiness [M]odel supplied by First Financial." *Id.*  Doctors Express advised plaintiffs that their business plan, as well as two subsequent revisions of the business plan prepared by the Hanleys in August and December 2010, were consistent with Doctors Express's expectations. *Id.*

From June through December 2010, the Hanleys prepared to open their Doctors Express franchise by (1) attending two four-day mandatory training sessions conducted by Doctors Express; (2) selecting a location for their urgent care center in Des Peres, Missouri, per the direction of Doctors Express's mandatory site selection consultant; (3) obtaining financing for

---

[8] The copy of the Franchise Agreement submitted by Doctors Express is fully executed, but appears to be missing several exhibits.  *See* Franchise Agreement at iii.

[9] The record does not contain a copy of the business plan.

the costs of construction and equipment; (4) entering into a lease and a contract for the construction of the Des Peres DRX center; (5) hiring medical personnel; (6) purchasing medical equipment and supplies; and (7) engaging the Lohman Group, Doctors Express's "credentialing and insurance payer contracting consultant," to provide services for physician credentialing and medical insurance reimbursement contracts.  *See* Complaint ¶ 20.

The Hanleys opened the Des Peres DRX center on January 15, 2011.  *See* Complaint ¶ 22.  The Des Peres center did not fare as well as Mr. and Ms. Hanley had expected, and they closed the Des Peres center on July 20, 2011.  *See* Complaint ¶ 24.

According to plaintiffs, the Des Peres center "operate[d] at a substantial financial loss each month," forcing Mr. and Ms. Hanley to infuse additional capital, because of lower-than-estimated patient volume and revenue, "lengthy delays in establishing the insurance reimbursement contracts," and "the inability to 'back bill' insurers for services rendered prior to" the insurance reimbursement contracts' effective date.  Complaint ¶¶ 23, 73.

The Hanleys contend that defendants made several misleading disclosures and failed to disclose material information in the course of plaintiffs' preparation to open the Des Peres DRX franchise, both before and after execution of the Franchise Agreement.  The allegations of the Complaint with regard to the alleged misrepresentations and nondisclosures are lengthy, and are divided into four categories: (a) the required initial investment; (b) the initial operating capital requirements; (c) the physician credentialing and health insurance reimbursement contracting process; and (d) the projected earnings and financial performance of the DRX franchise.  *See* Complaint ¶¶ 28-76, at 10-26.  Plaintiffs provided a comprehensive account of the Complaint's allegations in their Opposition at 7-17, which I quote at length:

 *A.  Initial Investment*

The . . . 2009 FDD, financial models, and advertising materials that plaintiffs received from [Doctors Express] and Rhino [ ] during the period January–March 2010 contained material misrepresentations relating to the estimated initial investment that would be required to operate a DRX franchise. The FDD provided to the Hanleys in January 2010 estimated that the initial investment would be $466,220 to $602,720. However, [Doctors Express] knew that the information was materially inaccurate prior to March 26, 2010, when the Hanleys executed the [Franchise Agreement]. [Complaint] ¶¶ 28-29.

[Doctors Express] stated that the 2009 FDD initial investment information was prepared in reliance on "the experience and data collected from our affiliate that operates an urgent care center (in Maryland),"[10] rather than the experience of its franchisees. However, as of January 2010 [Doctors Express] knew that the experience of and data from the Maryland Affiliate was materially different from that of its actual franchisees, and was not a reasonable basis on which to estimate the initial investment that a new franchisee would be required to make in 2010, because Medicare and private provider enrollment policies, required vendor contracts, and [Doctors Express's] franchise standards made the Maryland Affiliate's financial experience both misleading and nearly impossible for subsequent franchisees to replicate. As a result, on or about April 15, 2010—only two weeks after executing the Hanleys' Franchise Agreement—[Doctors Express] submitted [the 2010 FDD] to the California Commissioner of Corporations . . . . The 2010 FDD stated that based on the experience of its franchisees during 2009 as well as the experience of its Maryland Affiliate "[t]he total initial investment necessary to begin operation of a franchised business ranges from $508,500 to $693,000." This was 10-15 percent higher than the information contained in the 2009 FDD provided to plaintiffs. *Id.* ¶¶ 31-33. [However, it was still substantially below the plaintiffs' actual initial investment, which they assert was "more than $1 million." *Id.* ¶ 28.]

Among the specific cost fields in Section 7 that [Doctors Express] revised upward in the 2010 FDD, based on the experience of its franchisees, were those relating to signage to be acquired from [Doctors Express's] required vendor [for which the 2009 FDD provided an estimate of $2,500 to $5,000, but which was later revised in the 2010 FDD to between $5,000 and $20,000, consistent with plaintiffs' actual expenditure of over $16,000]; the recruiting costs for physicians and staff [which were stated in the 2009 FDD as between $1,000 and $3,500, but were revised in the 2010 FDD to between $3,000 and $20,000, which was still below the over $40,000 that plaintiffs paid]; and the construction and opening costs for the franchise. . . .

---

[10] According to the Complaint, at the time that the 2009 FDD was drafted in May 2009, there were no franchisees operating DRX franchises.  The only DRX urgent care facility then in existence was the original DRX urgent care center in Towson, Maryland, which was not a franchised center but was, instead, operated by STATCARE, an affiliate of Doctors Express (the "Maryland Affiliate").  However, by the time the FDD was transmitted to plaintiffs in January 2010, and by late March 2010, when the Hanleys executed the Franchise Agreement, several franchisees had begun operations.  *See* Complaint ¶¶ 31-32, 43, 74; *see also* FDD at 40-46.

*B. Initial Capital Requirements*

Another significant element of the estimated initial investment set out in Item 7 of the 2009 FDD was the "Additional Funds" required for the first three months of operation of the franchised business. [Doctors Express] stated that a franchisee should expect to need $50–90,000 of additional funds for working capital during the first 90 days of operations. This estimate was consistent with the [DRX Business Model] provided to plaintiffs by First Financial, which showed losses during for the first three months of franchise operations, followed by growing profitability starting with the fourth month of operations. However, at the time the Hanleys were given the 2009 FDD in late January 2010, but in any event before they signed the Franchise Agreement on March 26, 2010, [Doctors Express] knew that the "Additional Funds" estimate in the 2009 FDD was materially lower than the actual operating capital needs of a DRX franchisee. *Id.* ¶¶ 40-41.

The information that [Doctors Express] knew as of early 2010 as the result of the experience of its franchisees (as opposed to its Maryland Affiliate), but failed to disclose to the plaintiffs, was as follows:

-- The large majority of the monthly revenue received by its franchisees would come from third-party payers rather than patients: 60 percent from medical insurance payments, and another 20 percent from Medicare. [Doctors Express's] various representations to the plaintiffs in January–March 2010 assumed or explicitly stated that the typical franchise would open substantially or fully credentialed and with contracts with third-party payers in place. However, based on the experience of its franchisees during 2009 [Doctors Express] knew as of January–March 2010 that a franchise actually would not be fully "credentialed" or contracted with insurance payers at the time it opened. This meant that it would not have medical insurance reimbursement contracts in place to pay claims for patient services and, while the franchisee waited for credentialing and provider contracting to be completed, would have to resort to various interim stratagems that [Doctors Express] recommended to generate operating revenue, all of which involved substantial reductions in normal fees that could not be recovered from insurers at a later date. [Doctors Express] therefore knew that the revenues received during the initial months of a franchise's operations were likely to be substantially below the experience of its Maryland Affiliate as reported in Section 19 of the FDD, as well as the revenues shown in the [Doctors Express] business models. Moreover, [Doctors Express] knew that the interim revenue generation stratagems were materially inconsistent with [Doctors Express's] representations in its FDD, business models and marketing materials that average per patient revenues would be $125. *Id.* ¶¶ 42-43.

-- The reason [Doctors Express's] franchisees were unlikely to be fully credentialed as of their opening date was due to changes to the Medicare enrollment process in 2009 that were delaying the completion of the private insurer contracting process. Under the new process a provider could not apply for a Medicare CMS number until it was no more than 30 days away from

opening.[11] Because it typically takes more than 30 days to have a CMS number assigned, [Doctors Express] knew that a substantial number of its franchisees were opening without a CMS number. [Doctors Express] also knew that this circumstance materially delayed the process of obtaining insurance reimbursement contracts, because many major medical insurance companies would not process a contract request until the provider has received its CMS number. The delay in commencing the insurance contracting process, and the time required for the contracting process itself, further contributed to the material delay in the franchisee's ability to bill the insurers for payment and significantly increased the business' startup costs. *Id.* ¶¶ 44-46.

-- Finally, [Doctors Express] knew that the typical turnaround time for payment of its franchisees' insurance claim submissions far exceeded 14 days, as represented to plaintiffs prior to their execution of the Franchise Agreement. [Doctors Express] knew that the typical turnaround time experienced by its franchisees was similar to the urgent care industry average of between 30 and 90 days. This meant that even after an insurance reimbursement contract was approved, revenue flow from claims covered by the insurer did not begin for at least a month, if not longer. *Id.* ¶47.

\* \* \*

*C. Credentialing and Contracting*

In its promotional materials and verbal statements during January–March 2010, [Doctors Express] represented to the Hanleys that it would offer them significant expert assistance in the credentialing and insurance contracting processes. [Doctors Express] also stated that credentialing and contracting could be substantially completed in approximately three months and that if a franchisee started the process 90 days prior to opening, the center would have sufficient third-party payer contracts in place as of the time it began to provide medical services to patients.

When [Doctors Express] made these claims to plaintiffs it lacked the ability to adequately coordinate the processes for plaintiffs and never intended to do so. None of its employees had substantial training, certifications, or direct industry experience relating to the credentialing of providers or the contracting of centers. Furthermore, [Doctors Express] was aware that its efforts were yielding unacceptable results when the support promises were made to plaintiffs, because it knew no later than January 2010 that a number of its then-existing franchisees had opened without adequate credentialing and contracting having been completed. Furthermore, at the time the Hanleys were given the 2009 FDD in late January 2010, but in any event before the Hanleys signed the Franchise Agreement on March 26, 2010, [Doctors Express] knew that 90 days was not a sufficient period of time to complete the credentialing and contracting processes

---

[11] According to the Complaint, a "CMS number" is the identifying number assigned to a medical provider by the Medicare program upon approval as a Medicare provider. *See* Complaint ¶ 44.

and that regardless of when franchisees began the process, they were likely to open without a significant number of effective payer contracts because they could not side-step the payers' Medicare CMS number requirement. *Id.* ¶¶ 50-53.

In fact, shortly after plaintiffs signed the Franchise Agreement [Doctors Express] conceded in writing that the delays in the process were causing serious problems for franchisees, including "leading to increased start-up costs . . . leading to reduced long-term financial performance." [Doctors Express] knew these facts and circumstances on or before the date on which plaintiffs signed the Franchise Agreement. [Doctors Express] also knew as of the period January–March 2010 that because most of its franchisees worked with ten or more third-party payers, being contracted with only one or two payers at the time of opening can financially cripple the franchisee, because it will not be paid in-network rates when treating out-of-network patients, will experience a slower-than-typical growth rate, and will face substantial hurdles when developing an occupational medicine program. [Doctors Express] did not disclose any of this information to the plaintiffs prior to their execution of the Franchise Agreement, which was a further concealment of material information whose disclosure was necessary in order to make the FDD, the financial models and the [Doctors Express] marketing materials and statements, in light of the circumstances under which they were made, not misleading. *Id.* ¶¶ 54-56.

[Doctors Express] continued to conceal from plaintiffs its lack of expertise and ineffective coordination of the credentialing and contracting following their execution of the Franchise Agreement. [Doctors Express] did this by instructing plaintiffs and other franchisees to avoid contacting insurance payers or [Doctors Express's] preferred credentialing and contracting vendors to check on the status of their payer contracts and by failing to regularly audit the progress reported by [Doctors Express's] preferred credentialing vendor to plaintiffs. *Id.* ¶ 57.

In particular, [Doctors Express's] continued concealment of prior misrepresentations, and continued misrepresentation that it was actively and expertly involved in the credentialing and contracting process, took place in December 2010, just before the plaintiffs' franchise facility was to open. [Doctors Express's] credentialing vendor, The Lohman Group, misrepresented the status of the credentialing progress and falsely stated in a December 9 e-mail and conference call in which [Doctors Express] participated that as of the scheduled January 15, 2011, opening date plaintiffs would have three insurance reimbursement contracts in force, with a fourth to follow within two weeks. These statements were reiterated in an e-mail copied to [Doctors Express]. Following the call, [Doctors Express] told plaintiffs that substantial progress was being made on plaintiffs' behalf by the vendor, and that they had no reason to delay the opening of their franchise business because it would have a number of effective third-party payer contracts at opening and because the rest of the third-party payers  would permit plaintiffs to submit insurance claims related to patients plaintiffs treated before it received an effective payer contract once an effective date was assigned, through a process known as "back billing."

The Lohman Group's statements were reiterated in a December 21, 2010, e-mail. Plaintiffs forwarded this to [Doctors Express] along with a revised comprehensive plan for their franchise that reflected [Doctors Express's] representation that they could "back bill" for claims. [Doctors Express] assured plaintiffs once again that the financial plan reflected a reasonable analysis of their business' expected performance. In reliance on the representations made by [Doctors Express] and its credentialing consultant, plaintiffs committed to [Doctors Express] that they would open their facility on January 15, 2011.  *Id.* ¶¶ 58-63.

The representations made to plaintiffs in December 2010 by [Doctors Express] and The Lohman Group regarding the status of the franchise's credentialing and contracting, the availability of back billing options, and the reasonableness of plaintiff's December 2011 business plan based on that information were false. When the plaintiffs' franchise opened on January 15, 2011, it did not have a Medicare contract or approved reimbursement contracts with any private third party payers.  *Id.* ¶ 64.

[Doctors Express] knew as of December 9, 2010, that it was virtually certain that plaintiffs would not have a single effective third-party payer in place by January 15, 2011, because plaintiffs had not yet been able to apply for a CMS number (due to the 2009 changes in Medicare rules), and over 50% of plaintiffs' anticipated patient count was covered by medical insurance payers that required a CMS number before they would approve reimbursement contracts. Therefore, [Doctors Express] knew that The Lohman Group's representations regarding insurer contracts being effective as of the January 15, 2011, opening date were false. Despite this knowledge, [Doctors Express] concealed from plaintiffs the CMS number requirement, denied its existence when plaintiffs asked about it, and concealed from plaintiffs the fact that the approval of many insurance company contracts would be delayed far past the opening date. [Doctors Express] also concealed from plaintiff the materially negative impacts that this would have on the financial plan that plaintiffs submitted for review on December 20, 2010, and falsely stated that the plan was a reasonable analysis of the franchised business' expected performance.  *Id.* ¶¶ 65-66.

*D. Earnings and Financial Performance*

In Item 19 of the 2009 FDD, [Doctors Express] set forth an "earnings claim" and stated that, except for the information contained in the FDD, "we [Doctors Express] do not furnish or authorize our salespersons, brokers or agent to furnish any oral or written information concerning the actual, average, projected, or forecasted sales, costs, income, profits, or cash flow of any [DRX centers]."[12] On December 23, 2009, [Doctors Express] published an operations

---

[12] I am unable to locate the quoted statement in Item 19 of the FDD.  However, Item 19 of the FDD does contain a similar statement: "Other than the preceding financial performance representation [*i.e.*, the information in Item 19], Doctors Express does not make any financial performance representations. We also do not authorize our employees or representatives to make any such representations either orally or in writing."  FDD at 43.

memo and distributed it to its then-existing franchisees. On information and belief, [Doctors Express] communicated the contents of this memo to relevant vendors, such as Rhino [ ] and First Financial, before or shortly after the memo was published. This operations memo warned that "it is an earnings claim violation to provide any prospective franchisee with Doctors Express-authored financial business plan templates, pro formas, or earnings information . . . sharing any of Doctors Express' proprietary documents, templates, or materials violates these laws." *Id.* ¶¶ 67-68.

At the time the Hanleys were given the 2009 FDD in late January 2010, but in any event before the Hanleys signed the Franchise Agreement on March 26, 2010, [Doctors Express] knew that the above-quoted statement from Item 19 of the 2009 FDD was false. Prior to plaintiffs' execution of the franchise agreement, [Doctors Express] knowingly caused plaintiffs to receive and rely upon financial performance documentation by having it delivered through First Financial, with which [Doctors Express] had a close working relationship as a preferred vendor. *Id.* ¶ 69.

[Doctors Express] and First Financial knew when they provided plaintiffs with the financial model and related marketing materials in January–March 2010 that the model contained numerous material misstatements of fact and that the document was materially misleading, inasmuch as it did not depict a typical Doctors Express franchise center's performance, costs, or income. The misstatements included the following:

-- [Doctors Express's] models and sales literature included the often repeated claim that Doctors Express franchises . . . would open with and sustain an average per patient revenue of $125. [Doctors Express] knew at the time these claims were made that accomplishing this per patient revenue as of the day a franchised business opened was essentially impossible.

-- [Doctors Express] knew, and later conceded to franchisees, that the average per-patient revenues for new franchise centers were far below $100.00, that centers routinely opened without being fully credentialed or contracted, and that an average franchisee's revenue per patient increased over a period of months as centers added occupational medicine clients and third-party payer contracts.

-- [Doctors Express] and First Financial also provided plaintiffs with "typical" or "average" patient volume information that [Doctors Express] knew to be both inaccurate and misleading when they provided the data to plaintiffs. [Doctors Express] regularly made representations of financial performance based on patient volume data from industry surveys that [Doctors Express] represented to be an accurate representation of a franchised business' performance. However, while presenting prospective franchisees with data that indicated that "typical" urgent care centers treated an average of 45 patients per day and routinely received a reimbursement of $112 per patient visit, [Doctors Express] knew during the period January–March 2010 that even its most established and highest performing center was treating a comparatively low average of just 27 patients per day, that typical patient reimbursements fell far below $112 for the majority of its

- 13 -

franchised locations, and that new franchisees typically saw just 11 or 12 patients a day. *Id.* ¶¶ 70-73

[Doctors Express] continued to mislead plaintiffs as to the actual costs and earning potential of the franchised business even after plaintiffs signed a Franchise Agreement. After March 26, 2010, [Doctors Express] knew of plaintiffs' continued reliance on the misleading and incorrect claims of the FDD, sales literature, and First Financial models because plaintiffs provided [Doctors Express] for review three full business plans that made plaintiffs' reliance on the false and misleading financial performance data apparent to [Doctors Express]. Nevertheless, [Doctors Express] failed to inform plaintiffs about the material errors in their business plans, instead assuring them that the plans were reasonable and consistent with [Doctors Express's expectations for the franchise. . . .

Finally, the financial data in Items 7 and 19 of the 2009 FDD were based on the experience of and data collected from [Doctors Express's] Maryland Affiliate that operated a DRX center in Towson, Maryland. At the time the Hanleys were given the 2009 FDD in late January 2010, but in any event before the Hanleys signed the Franchise Agreement on March 26, 2010, [Doctors Express] knew that using the Maryland Affiliate as a basis for Item 7, Item 19, and other portions of the FDD and advertising material was materially misleading to prospective franchisees such as plaintiffs, because the Maryland Affiliate was not representative of the experience of new franchises. The Maryland Affiliate was opened in 2006, several years before major changes to Medicare enrollment procedures made it exceedingly difficult or impossible to open fully credentialed and contracted, and the Maryland Affiliate was not required to make use of expensive required vendors. [Doctors Express] therefore knew that the Maryland Affiliate's experience was not readily capable of replication by new franchisees and that using it as a basis for the FDD was materially inaccurate and misleading. *Id.* ¶ 76.

In July 2011, before closing the Des Peres DRX center, plaintiffs attempted to sell the center to Jeff Maurer, who was Doctors Express's "Master Franchisor."  Complaint ¶ 25. Plaintiffs and Maurer reached an agreement in principle to sell the franchise to Maurer for $400,000, a sum that was significantly less than plaintiffs' investment, but Doctors Express refused to approve the transaction unless plaintiffs executed a release of claims against Doctors Express. *Id.*  Plaintiffs contend that Doctors Express's insistence on such a waiver constituted a further violation of the Maryland Franchise Law.  Although Doctors Express ultimately approved the sale of the franchise to Maurer in August 2011, its consent remained subject to

limitations with regard to plaintiffs' claims against Doctors Express, and Maurer withdrew his

offer due to the delay in obtaining Doctors Express's approval. *Id.* ¶ 26.

  This suit followed. Additional facts are included in the Discussion.

## Discussion

### A. Standard of Review

  As noted, Rhino has moved to dismiss under Rule 12(b)(6), while Doctors Express has

moved in the alternative either to dismiss under Rule 12(b)(6) or for summary judgment under

Rule 56. Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual

disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.,* 510 F.3d 442, 450

(4th Cir. 2007). However, a motion alternatively seeking dismissal or summary judgment

"implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure."

*Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F.Supp. 2d 431, 436-37 (D. Md.

2011)). Rule 12(d) permits a court, in its discretion, to consider matters outside of the pleadings

in connection with a motion filed under Rule 12(b)(6).

  Under Rule 12(d), a district judge has "complete discretion to determine whether or not

to accept the submission of any material beyond the pleadings that is offered in conjunction with

a Rule 12(b)(6) motion and rely on it, . . . or to reject it or simply not consider it." 5C WRIGHT &

MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2012 Supp.). This

discretion "should be exercised with great caution and attention to the parties' procedural rights."

*Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is

likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of

the summary judgment procedure" is necessary. *Id.* at 165-67. However, if the court chooses to

consider the extraneous material, "the motion must be treated as one for summary judgment

under Rule 56." Fed. R. Civ. P. 12(d).[13]  Therefore, "[w]hen the extra-pleading material is comprehensive and will enable a rational determination of a summary judgment motion in accordance with the standard set forth in Rule 56, the district court is likely to accept it." 5C WRIGHT & MILLER, § 1366, at 165.  In contrast, when the extraneous material is "scanty, incomplete, or inconclusive, the district court probably will reject it." *Id.* at 165-66.

In my view, it is neither necessary nor appropriate at this juncture to convert the DRX Motion to one for summary judgment.  Notably, no discovery has yet occurred.  Moreover, the extraneous documents submitted by the parties are not comprehensive.  Nevertheless, there are certain matters beyond the four corners of the complaint that a court may consider in the context of a motion to dismiss under Rule 12(b)(6), without conversion under Rule 12(d).  A court may properly consider documents "attached or incorporated into the complaint." *E.I. du Pont*, *supra*, 637 F.3d at 448; *see also Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  And, the court may consider documents submitted with the motion to dismiss that are "'integral to and explicitly relied on in the complaint,'" so long as "there [is] no authenticity challenge" to those documents. *E.I. du Pont*, 637 F.3d at 448 (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)); *see also Philips*, 572 F.3d at 180.

Plaintiffs do not dispute the authenticity of the 2009 FDD or the Franchise Agreement submitted by Doctors Express.  Moreover, both documents were explicitly relied on in the Complaint and are integral to plaintiffs' allegations.  Therefore, consideration of these

---

[13] If the court intends to exercise its discretion under Rule 12(d) to convert a motion to dismiss to one for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).  However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

documents does not necessitate conversion of the motions under Rule 12(d).    In addition, I can consider Exhibit D to the DRX Motion (ECF 13-2 at 107), which is captioned "Maryland Disclosure."  Although the Maryland Disclosure was submitted as a separate exhibit, it appears to be an addendum incorporated by reference into the FDD, intended to augment or amend certain portions of the FDD in order to comply with the Maryland Franchise Law.[14]  Plaintiffs have not disputed the authenticity of the Maryland Disclosure.

Both Doctors Express and the Hanleys have submitted other exhibits at well.  But, I will exercise my discretion not to consider them in connection with the motions.  In particular, Doctors Express has submitted two other exhibits: a "Franchisee Compliance Certification," which was executed by Mr. and Ms. Hanley on the same day as the Franchise Agreement and appears (based on the document footer in the lower left-hand corner) to have been an exhibit or addendum to the FDD, *see* Ex.C to DRX Motion (ECF 13-2 at 103); and an unauthenticated copy of an email from Mr. Hanley to Renee Lohmann of the Lohmann Group, dated July 6, 2011, regarding the failure to obtain physician credentialing and insurance reimbursement contracts for the Des Peres DRX center.  *See* Ex.E to DRX Motion (ECF 13-2 at 109).  For their part, plaintiffs have submitted two exhibits for the Court's consideration.  In addition to the 2010 FDD, which I already mentioned, *see* note 6 *supra*, plaintiffs submitted a combined exhibit consisting of an unauthenticated series of emails between Mr. Hanley and Mr. Schadle and a printout of a webpage that, according to plaintiffs, appeared when an instruction to "click here" contained in one of Mr. Schadle's emails was followed.  *See* Ex.2 to Opposition (ECF 17-2).  As I will explain in more detail *infra*, consideration of these exhibits is unnecessary to evaluation of the parties' claims.  Moreover, consideration of them would not "facilitate the disposition of the

---

[14]  The FDD stated: "Certain states require franchisors to make additional disclosures related to the information contained in this disclosure document. If applicable, these additional disclosures will be furnished to you in an addendum."  FDD at unnumbered page ii.

action," 5C WRIGHT & MILLER § 1366, at 165, because even if I were to consider the exhibits, they would not alter my analysis.

Accordingly, I will examine both motions under the familiar standard of Rule 12(b)(6). Under that standard, a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). Whether a complaint states a claim for relief is judged by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To be sure, the plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). But, the Rule demands more than bald accusations or mere speculation. *Id.* To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . .[the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556. In other words, a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570. A complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient. *Id.* at 555. If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown that "'the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citation omitted).

Typically, a motion pursuant to Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted). But, "in the relatively rare

circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint," the court may resolve the applicability of a defense by way of a Rule 12(b)(6) motion. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). "This principle only applies, however, if all facts necessary to the affirmative defense '*clearly appear*[ ] *on the face of the complaint*,'" or in other documents that are proper subjects of consideration under Rule 12(b)(6). *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*).

It is also noteworthy that the allegations of fraud implicate the heightened pleading standard under Fed. R. Civ. P. 9(b). Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Under the rule, a plaintiff alleging claims that sound in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (citation omitted). In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Construction II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted).

Rule 9(b) serves several salutary purposes:

> "First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

Notably, however, Rule 9(b) by its plain text permits general averment of aspects of fraud that relate to a defendant's state of mind.  And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts."  *Harrison*, 176 F.3d at 784. Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'"  *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, Civ. No. HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)); *accord Gadson v. Supershuttle International*, Civ. No. AW-10-1057, 2011 WL 1231311, at * 9 (D. Md. Mar. 30, 2011).

### B.  Substantive Law

Before addressing the parties' contentions, it is helpful to provide some background regarding the three causes of action that plaintiffs assert.

### 1.  Maryland Franchise Law

In Count I, plaintiffs assert violations of the Maryland Franchise Law.  Under that statute, a "franchise" is defined, in pertinent part, as follows:

> "Franchise" means an expressed or implied, oral or written agreement in which:
>
> (i) a purchaser is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by the franchisor;
>
> (ii) the operation of the business under the marketing plan or system is associated substantially with the trademark, service mark, trade name, logotype, advertising, or other commercial symbol that designates the franchisor or its affiliate; and
>
> (iii) the purchaser must pay, directly or indirectly, a franchise fee.

B.R. § 14-201(e)(1).  The term "franchisor" means "a person who grants a franchise."  B.R. § 14-201(h).

The Maryland Franchise Law "applies to an offer to sell or sale of a franchise" where the franchise fee exceeds $100, B.R. § 14-203(a)(1), and one of the following conditions apply:

> (i) the offeree or franchisee is a resident of the State;
> (ii) the franchised business will be or is operated in the State;
> (iii) the offer to sell is made in the State; or
> (iv) the offer to buy is accepted in the State.

B.R. § 14-203(a)(2).

An offer to sell is made in Maryland if, *inter alia*, it "originates from" Maryland, B.R. § 14-203(b)(1)(i), and an offer to buy is accepted in Maryland if "acceptance is communicated to the offeror" in Maryland.  B.R. § 14-203(b)(3).  There is no dispute in this case that the Maryland Franchise Law applies to the DRX franchise offer, because the Franchise Agreement was transmitted by plaintiffs to Doctors Express at its principal office in Maryland.

With exceptions not relevant here, the Maryland Franchise Law requires any person who "offers to sell, through advertisement or otherwise, or sells [a] franchise" subject to the statute to "register the offer of [the] franchise" in advance with the Securities Commissioner in the Office of the Attorney General of Maryland (the "Commissioner").  B.R. § 14-214(a); *see* B.R. § 14-201(d) (defining "Commissioner").  In order to register a franchise offer, a registrant must submit to the Commissioner a "prospectus" containing specified information about the franchise offer, the franchisor, and persons or entities "affiliated with the franchisor."  B.R. § 14-216 (defining contents of prospectus).  In many respects, the required contents of a prospectus under the Maryland Franchise Law overlap with the required contents of an FDD under the FTC's Franchise Rule.  *Compare* B.R. § 14-216 *with* 16 C.F.R. §§ 436.4 & 436.5.

The Maryland Franchise Law establishes criminal liability for several types of misconduct in connection with the offer or sale of a franchise, *see* B.R. §§ 14-211 & 14-228 to 14-232, and also grants interpretive rulemaking and civil enforcement authority to the Commissioner.   *See* B.R. §§ 14-206 (rulemaking authority); 14-209 (authority to issue interpretive opinions); 14-210 (civil enforcement authority); 14-221 (authority to issue stop orders).   Pursuant to statutory authorization, the Commissioner has issued regulations implementing and augmenting the statute.   *See* Code of Maryland Regulations ("COMAR"), Title 2, Subtitle 2, ch. 8.

In addition, the Maryland Franchise Law creates a private right of action for any "person who buys or is granted a franchise" against a "person who sells or grants a franchise," B.R. § 14-227(a)(1), for selling or offering a franchise without having registered the offer with the Commissioner (which is not at issue here), *see* B.R. § 14-227(a)(1)(i), or for selling or offering a franchise

> by means of an untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, if the person who buys or is granted a franchise does not know of the untruth or omission.

B.R. § 14-227(a)(1)(ii).   Count I of plaintiffs' Complaint is founded on this cause of action.

A successful plaintiff under B.R. § 14-227 may "recover damages sustained by the grant of the franchise," B.R. § 14-227(b), and may obtain a court order directing the "person who sells or grants [the] franchise" to "rescind the franchise" and to "make restitution" to the plaintiff. B.R. § 14-227(c).   The private right of action establishes a broad scope of presumptive joint and several liability.   B.R. § 14-227(d)(1) states:

> Joint and several liability . . . extends to:
>
> > (i) each person who directly or indirectly controls a person liable under [B.R. § 14-227];

(ii) each partner in a partnership liable under [B.R. § 14-227];

(iii) each principal officer or director of a corporation liable under [B.R. § 14-227];

(iv) each other person that has a similar status or performs similar functions as a person liable under [B.R. § 14-227]; and

(v) each employee of a person liable under [B.R. § 14-227], if the employee materially aids in the act or transaction that is a violation under [the Maryland Franchise Law].[15]

Despite the joint and several liability provisions, the statute exempts from liability any "person who did not have knowledge of or reasonable grounds to believe in the existence of the facts by which the liability is alleged to exist."  B.R. § 14-227(d)(2).  Nevertheless, the statute makes clear that this exemption for lack of actual or constructive knowledge is an affirmative defense: "In determining liability under [B.R. § 14-227(a)], the person who sells or grants a franchise has the burden of proving that the person who sells or grants a franchise did not know and, in the exercise of reasonable care, could not have known of the untruth or omission."  B.R. § 14-227(a)(2).

B.R. § 14-226 is also relevant.  It states: "As a condition of the sale of a franchise, a franchisor may not require a prospective franchisee to agree to a release, assignment, novation, waiver, or estoppel that would relieve a person from liability under [the Maryland Franchise Law]."  Interpreting this provision in *Three M Enterprises, Inc. v. Texas D.A.R. Enterprises, Inc.*, 368 F. Supp. 2d 450 (D. Md. 2005), Judge Richard D. Bennett held that "waivers and releases of a plaintiff's rights under the Maryland franchise laws," if they are executed in the course of a franchise sale transaction in violation of B.R. § 14-226, "are void as such clauses violate a

---

[15] Perhaps because of the joint and several liability provisions of B.R. § 14-227(d)(1), defendants Ross, Bonacuse, and Burger (the members of Doctors Express) have not raised a legal challenge to their individual liability at this juncture.  *See Three M Enters., Inc. v. Texas D.A.R. Enters., Inc.*, 368 F. Supp. 2d 450, 459 n.11 (D. Md. 2005) (holding that parent company and officers of franchisor could "be held liable as 'franchisors' . . . in light of the clear language of [B.R. §] 14-227(d)").

fundamental public policy of the State." *Id.* at 459 (citing *Nat'l Glass, Inc. v. J.C. Penney Props., Inc.*, 336 Md. 606, 614, 650 A.2d 246, 250 (1994) (construing similar provision in analogous statute)).

### 2. Fraud

Count II alleges the tort of fraud.  Under Maryland law,[16] "'[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'"  *Sass v. Andrew*, 152 Md. App. 406, 432, 832 A.2d 247, 261 (2003) (citation omitted).  Regardless of the particular theory, the plaintiff must establish the elements of fraud "by clear and convincing evidence."  *Md. Envir. Trust v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512, 516 (2002).

The fraudulent misrepresentation and fraudulent concealment theories of the tort are relevant here.  In an action for fraudulent misrepresentation (which is the garden variety of fraud and often is described simply as "fraud"), the plaintiff ordinarily must show:

> 1) that the defendant made a false representation to the plaintiff;
>
> 2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth;
>
> 3) that the misrepresentation was made for the purpose of defrauding the plaintiff;
>
> 4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and
>
> 5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Nails v. S&R, Inc.*, 334 Md. 398, 415, 639 A.2d 660, 668 (1994); *accord Thomas v. Nadel*, 427 Md. 441, 451 n.18, 48 A.3d 276, 282 n.18 (2012); *Sass*, 152 Md. App. at 429, 832 A.2d at 260.

---

[16] The parties have briefed the tort law issues under Maryland case law, without expressly addressing the issue of choice of law.  Accordingly, I assume, without deciding, that Maryland tort law applies.  However, I also note that § 17.6 of the Franchise Agreement provided that "all claims arising from the relationship between [Doctors Express] and [the Hanleys] will be governed by the laws of the State of Maryland . . . ."

To be actionable, a false representation "must be of a material fact." *Gross v. Sussex, Inc.*, 332 Md. 247, 258, 630 A.2d 1156, 1161 (1993). "A 'material' fact is one on which a reasonable person would rely in making a decision," *Sass*, 152 Md. App. at 430, 832 A.2d at 260, or a fact that "'the maker of the misrepresentation knows . . . [the] recipient is likely to regard . . . as important.'" *Gross*, 332 Md. at 258, 630 A.2d at 1161 (citation omitted). The "misrepresentation must be made with the deliberate intent to deceive," *Sass*, 152 Md. App. at 430, 832 A.2d at 260 (citing *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188 (1998)), and the defendant must "know[ ] that his representation is false" or be "recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity." *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 232, 652 A.2d 1117 (1995).

A mere failure to disclose a material fact does not constitute fraud, in the absence of a legal duty to disclose that inheres in certain types of transactions, because "Maryland recognizes no general duty upon a party to a transaction to disclose facts to the other party." *Gaynor*, 370 Md. at 97, 803 A.2d at 516. However, "[e]ven in the absence of a duty of disclosure, one who *suppresses or conceals facts which materially qualify representations made* to another may be guilty of fraud." *Finch v. Hughes Aircraft Co.*, 57 Md. App. 190, 239, 469 A.2d 867 (emphasis added), *cert. denied*, 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied*, 469 U.S. 1215 (1985).

A fraud based on active suppression or concealment of material facts or an intentional failure to disclose facts that the defendant is legally obligated to disclose is the variety of fraud referred to as "fraudulent concealment." With respect to active suppression or concealment of facts, "Fraudulent Concealment 'is any statement or other conduct which prevents another from acquiring knowledge of a fact, such as diverting the attention of a prospective buyer from a defect which otherwise, he would have observed.'" *Lloyd v. Gen'l Motors Corp.*, 397 Md. 108,

138, 916 A.2d 257, 274 (2007).   In other words, it describes a "situation where the defendant actively undertakes conduct or utters statements designed to, or that would, divert attention away from" a material fact.  *Id.* at 138 n.11, 916 A.2d at 274 n.11.  "'To create a cause of action, concealment must have been intentional and effective—the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact.  The affirmative suppression of the truth must have been with intent to deceive.'"  *Fegeas v. Sherrill*, 218 Md. 472, 476-77, 147 A.2d 223, 225-26 (1958) (citation omitted); *accord Rhee v. Highland Dev. Corp.*, 182 Md. App. 516, 524, 958 A.2d 385, 390 (2008).   As the *Rhee* Court explained, *id*. at 536, 958 A.2d at 396 (internal citation omitted) (alterations in *Rhee*):

> [T]he concealment or suppression [of a material fact] is in effect a representation that what is disclosed is the whole truth. The gist of the action [for fraud] is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant . . . .

A "claim of failure to disclose, on the other hand, requires only that the defendant remain silent about, or omit, facts," and is not actionable unless "the defendant had a duty to disclose." *Lloyd*, 397 Md. at 138 n.11, 916 A.2d at 274 n.11.   Where the fraudulent concealment claim is based on a duty to disclose, Maryland courts have formulated the elements of the cause of actions as follows:

> "(1) [T]he defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment."

*Blondell v. Littlepage*, 413 Md. 96, 119, 991 A.2d 80, 94 (2010) (quoting *Lloyd*, 397 Md. at 138, 916 A.2d at 274) (emphasis omitted).

The Maryland Court of Appeals encapsulated the foregoing principles in *Frederick Road*

*Limited Partnership v. Brown & Sturm*, 360 Md. 76, 100 n.14, 756 A.2d 963, 976 n.14 (2000)

(internal citations omitted):

> Ordinarily, non-disclosure does not constitute fraud unless there exists a duty of disclosure.  Absent a fiduciary relationship, this Court has held that a plaintiff seeking to establish fraudulent concealment must prove that the defendant took affirmative action to conceal the cause of action and that the plaintiff could not have discovered the cause of action despite the exercise of reasonable diligence, and that, in such cases, the affirmative act on the part of the defendant must be more than mere silence; there must be some act intended to exclude suspicion and prevent injury, or there must be a duty on the part of the defendant to disclose such facts, if known.

### 3. Constructive Fraud

Count III is styled as a claim for "Constructive Fraud."  Complaint at 31.  Constructive

fraud is a "breach of a legal or equitable duty which, irrespective of the moral guilt of the fraud

feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or

private confidence, or to injure public interests."  *Gaynor*, *supra*, 370 Md. at 97, 803 A.2d at

516-17; *accord Canaj, Inc. v. Baker & Div. Phase III*, 391 Md. 374, 421-22, 893 A.2d 1067,

1095 (2006).  However, "[e]ven noncompliance with a legal duty need not *necessarily* amount

to constructive fraud."  *Scheve v. McPherson*, 44 Md. App. 398, 407, 408 A.2d 1071, 1077

(1979) (emphasis in original).

"'Where . . . a party is justified in believing that the other party will not act in a manner

adverse or inconsistent with the reposing party's interest or welfare, constructive fraud may be

found to arise from a violation of this belief.'"  *Alleco Inc. v. Harry & Jeanette Weinberg*

*Found., Inc.*, 340 Md. 176, 198 n.6, 665 A.2d 1039, 1049 n.6 (1995) (citation omitted).  Unlike

fraudulent misrepresentation or fraudulent concealment, constructive fraud "is not an intentional

tort."  *D'Aoust v. Diamond*, 424 Md. 549, 571, 36 A.3d 941, 954 (2012); *accord Ellerin*, *supra*,

337 Md. at 236 n.11, 652 at 1126 n.11 ("'Neither actual dishonesty of purpose nor intent to

deceive is an essential element of constructive fraud.'") (citation omitted).

"'[C]onstructive fraud . . . usually arises from a breach of duty where a relationship of trust and confidence exists.'" *Alleco*, 340 Md. at 198 n.6, 665 A.2d at 1049 n.6 (quoting *Crawford v. Mindel*, 57 Md. App. 111, 120-21, 469 A.2d 454, 459 (1984)). Notably, "a confidential relationship exists where one party has dominion over the other person, and the relationship is such that the person with greater influence is expected to act in the best interest of the other person." *Brass Metal Prods. v. E-J Enters.*, 189 Md. App. 310, 356, 984 A.2d 361, 388 (2009). Classic examples of confidential relationships are "attorney-client relationships, trustee-beneficiary relationships, and . . . some family relationships." *Id.*

> "[G]enerally, business relationships are not confidential relationships." Where businesses are engaged in an "arm's length" transaction, a confidential relationship does not exist.
>
> To be sure, a confidential relationship may exist in a business relationship. Certain factors above and beyond a typical business relationship must exist, however.
>
> For example, a confidential relationship may exist when there is a relationship independent of the business relationship. Additionally, a confidential relationship may exist in a business relationship if "confidences are reposed by one person in another, who as a result gains an influence and superiority over him."

*Id.* at 357-58, 984 A.2d at 388-89 (citations omitted).

Both Doctors Express and Rhino challenge plaintiffs' claim of constructive fraud on the basis that there was no confidential relationship between plaintiffs and defendants. Rather, defendants claim, the franchise sale was an arms-length business transaction. This contention can be resolved in short order because, in their Opposition, plaintiffs do not claim that they were in a confidential relationship with defendants. *See* Opposition at 35. Rather, plaintiffs base their cause of action for constructive fraud on defendants' alleged breach of the duties of disclosure

set forth in the Maryland Franchise Law.  *Id.* at 36.

Although constructive fraud can arise from breach of a legal duty outside of a confidential relationship, not every breach of legal duty will support such a claim.  Indeed, in *Scheve*, *supra*, 44 Md. App. 398, 408 A.2d 1071, the leading case on which plaintiffs rely, the Maryland Court of Special Appeals said that noncompliance with a legal duty did not necessarily constitute constructive fraud.  *Id.* at 407, 408 A.2d at 1077.  Generally speaking, the types of legal duties that may underpin a constructive fraud claim are duties whose breach has a "tendency to deceive others, to violate public or private confidence, or to injure public interests." *Gaynor*, *supra*, 370 Md. at 97, 803 A.2d at 516-17.  *Scheve* is part of a line of Maryland cases beginning with *Jannenga v. Johnson*, 243 Md. 1, 220 A.2d 89 (1965), in which failure to comply with statutory notice and service requirements has been held, in some circumstances, to constitute "constructive fraud," so as to satisfy the "fraud" requirement imposed by Maryland Rule 2-535(b) and its predecessors, in order for a court to "exercise revisory power and control over [a previously entered] judgment in case of fraud, mistake, or irregularity."  Md. Rule 2-535(b).[17]

Plaintiffs have cited no reported opinion, and I am aware of none, in which a Maryland appellate court held that the violation of disclosure requirements of the Maryland Franchise Law or any analogous statute is the type of breach of legal duty that could support a tort claim for damages based on constructive fraud.[18]  To the extent that such a claim would be viable, it would

---

[17] Fed. R. Civ. P. 60(b) is the analog to Md. Rule 2-535(b) in federal district courts.

[18] Aside from *Scheve*, plaintiffs cite *SpinCycle, Inc. v. Kalender*, 186 F. Supp. 2d 585 (D. Md. 2002), in which the court denied summary judgment as to a constructive fraud claim. *SpinCycle* involved the sale of a laundromat business, and the purchaser alleged that the seller had provided inaccurate information about the business.  However, *SpinCycle* did not involve the Maryland Franchise Law.  Perhaps more important, the defendant in *SpinCycle* did "not dispute that he had a legal duty to provide accurate information under *Scheve*," for purposes of the

largely duplicate the statutory cause of action contained in the Maryland Franchise Law itself. Accordingly, I see no basis to muddy the waters with a constructive fraud tort claim that may not be viable under Maryland law and is at best redundant in light of plaintiffs' other causes of action.

As a fallback position, plaintiffs argue that, "even if the Court determines that Count III does not state a claim for constructive fraud, it should deem it to state a claim for negligent misrepresentation and deny the motion to dismiss."  Opposition at 37.  The tort of negligent misrepresentation arises "when the defendant owes a duty of care in communicating information to the plaintiff and that duty is breached, causing pecuniary or personal injury to the plaintiff." *Griesi v. Atl. Gen. Hosp. Corp.*, 360 Md. 1, 11, 756 A.2d 548, 553 (2000).  The tort consists of the following elements:

> "(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;
>
> (2) the defendant intends that his statement will be acted upon by the plaintiff;
>
> (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;
>
> (4) the plaintiff, justifiably, takes action in reliance on the statement; and
>
> (5) the plaintiff suffers damage proximately caused by the defendant's negligence."

*Lloyd*, *supra*, 397 Md. at 136, 916 A.2d at 273 (citation and some internal quotation marks omitted).

Plaintiffs expressly styled Count III as a claim for "constructive fraud," and Count III does not contain any language suggesting the elements of negligent misrepresentation.  Even if the facts alleged by plaintiffs could support a claim of negligent misrepresentation, plaintiffs,

---

constructive fraud tort, *id.* at 591, and so the court did not need to resolve that issue.  The parties' dispute in *SpinCycle* turned on whether plaintiffs had adduced triable evidence that the information defendant provided to plaintiff was inaccurate.  *See id.*  Accordingly, I do not find *SpinCycle* apposite here.

who are the masters of their complaint, did not choose to assert that cause of action.  "It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss."  *Saunders v. Putnam Am. Gov't Income Fund*, Civ. No. JFM-04-560, 2006 WL 1888906, at *2 n.2 (D. Md. July 7, 2006).

Nevertheless, plaintiffs cite *Labram v. Havel*, 43 F.3d 918, 920 (4th Cir. 1995), for the proposition that, even where a party's labeling of its claim "reflects a flat misapprehension by counsel respecting a claim's legal basis, dismissal on that ground alone is not warranted so long as any needed correction of legal theory will not prejudice the opposing party."  I do not view *Labram* as entirely analogous.  *Labram* involved a district court's dismissal, with prejudice, of an entire case.  Those are not the circumstances here.  As I will explain, plaintiffs' claims under Counts I and II, in certain respects, will proceed to discovery.  Moreover, if plaintiffs wish to do so, they may file a motion, in compliance with Fed. R. Civ. P. 15(a)(2), Local Rule 103.6, and any scheduling order issued by the Court, seeking leave to file an amended complaint that expressly and clearly articulates a cause of action for negligent misrepresentation.

Accordingly, Count III will be dismissed, without prejudice.  I turn to the other arguments advanced by defendants.

## C.  Doctors Express

With respect to Count I and Count II, Doctors Express advances two principal contentions.  First, it claims that plaintiffs fail to allege that Doctors Express made any misrepresentations of fact, because all of the representations in the FDD and Franchise Agreement that plaintiffs challenge were expressly labeled as estimates and projections, which are not statements of fact and are therefore not actionable, either under the Maryland Franchise Law or under a common law fraud theory.  According to Doctors Express, the FDD expressly

stated that the projections and estimates were based on the performance of the Towson DRX facility operated by its affiliate, and warned prospective franchisees that the projections and estimates could not be relied upon to predict accurately the future performance of a franchise. As Doctors Express sees the matter, it did not misrepresent the actual past performance of the Towson DRX center, and plaintiffs cannot plausibly contend that Doctors Express intended to defraud them.  Second, Doctors Express asserts that plaintiffs expressly disclaimed any reliance on statements outside of the FDD and the Franchise Agreement, and so plaintiffs cannot claim that their reliance on such statements was reasonable.

As to Doctors Express's first claim, plaintiffs acknowledge that, as another judge in this district held in *Jaguar Land Rover North America, LLC. v. Manhattan Imported Cars, Inc.*, 738 F. Supp. 2d 640 (D. Md. 2010), "[e]stimates or projections of future profits are statements of opinion . . . and not fact." *Id.* at 650.  However, plaintiffs argue that Doctors Express overlooks an important caveat articulated by the *Jaguar Land Rover* Court: "[I]naccurate projections of . . . future profitability and inaccurate planning volumes could . . . be considered fraudulent if there was evidence that the [defendant] knew they were inaccurate at the time they were made." *Id.* According to plaintiffs, all of defendants' estimates and projections fall into this category.

In my view, plaintiffs have asserted a viable claim under the Maryland Franchise Law and at common law.  Among other assertions, they allege that the estimates and projections provided by Doctors Express constituted "untrue statement[s] of a material fact" or "omission[s] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading," B.R. § 14-227(a)(1)(ii), within the meaning of the Maryland Franchise Law.  And, they maintain that the false statements and omissions constituted knowingly false misrepresentations or concealment of material facts.  In

addition, plaintiffs provided detailed allegations, summarized *supra*, that satisfy the Rule 9(b) standard regarding the particulars of the alleged misrepresentations.  To be sure, countervailing evidence may paint a different picture.  But, at the motion to dismiss stage, at which the well pleaded allegations of the complaint are accepted as true, and reviewed for sufficiency to state a legally cognizable claim, plaintiffs have asserted a plausible entitlement to relief.  Case law supports this conclusion.

For instance, in *Motor City Bagels, LLC v. American Bagel Co.*, 50 F. Supp. 2d 460 (D. Md. 1999), the court held that franchisees asserted triable claims of common law fraud and violation of statutory franchise disclosure requirements against a franchisor where there was evidence that the franchisor knew or should have known of undisclosed information that rendered the projections inaccurate and unreliable.[19]  As in this case, the plaintiffs' case in *Motor City Bagels* was buttressed by the fact that a later version of the franchisor's Franchise Disclosure Document (at that time called a Uniform Franchise Offer Circular or "UFOC"), which allegedly was not provided to the franchisees, contained projections significantly different from those in the older UFOC that was provided, and the franchisor knew or should have known the information contained in the later UFOC at the time the franchise agreement was executed.[20]

---

[19] Although the *Motor City Bagels* Court applied Indiana's franchise disclosure statute and Virginia common law as to fraud, the same legal principles apply here.

[20] As discussed, I need not consider the actual content of the 2010 FDD submitted as an exhibit by plaintiffs.  Plaintiffs have alleged the relevant contents of the 2010 FDD in their Complaint, and their factual allegations are assumed to be true.  *See, e.g.*, *Shaver v. Operating Eng'rs Local 428 Pension Trust Fd.*, 332 F.3d 1198, 1201 (9th Cir. 2003) (holding that district court properly declined to consider extraneous documentary evidence submitted by plaintiffs in connection with Rule 12(b)(6) motion, where documents "merely substantiated their claims," saying: "At that point, the material was superfluous because the non-moving party does not have to substantiate its allegations; the Court presumes everything it claims is true anyway.") (cited in 5C WRIGHT & MILLER § 1366, at 166 n.19).

With respect to the statutory franchise disclosure claims regarding inaccurate estimates of initial investment costs, the *Motor City Bagels* Court said, *id.* at 469-70 (internal citations omitted):

> First, the initial investment costs provided in the [older] UFOC would constitute a false statement as they would not have been based "on the latest available data." In addition, the representation of the cost figures in the disclosure document would be actionable as "they did not accurately reflect past or present circumstances."
>
> Second, this information is unquestionably material as it would significantly alter the total mix of information available to a prospective franchisee. A comparison of the initial investment costs reported in the [older] UFOC with the figures listed in the [more recent] UFOC shows a nearly twenty percent increase at the low end of the range (from $240,400 to $288,300) and a twenty-three percent rise at the high end (from $304,500 to $376,000). Indeed, in the case at bar, the initial investment cost constituted a central assumption in the plaintiffs' business plan and changes in this variable clearly have a dramatic impact on the profitability of such enterprises.
>
> Third, the plaintiffs could demonstrate that they were harmed by reliance on the defendants' misrepresentations as they arguably would not have entered into the various contractual obligations with American Bagel had the defendants disclosed the higher initial investment cost estimates. Moreover, the plaintiffs could argue that their reliance was reasonable as the franchisors disclosed this information to aid potential franchisees assess the merits of a Chesapeake Bagel Bakery as a business opportunity.

The *Motor City Bagels* Court reached a similar conclusion with respect to the franchisees' common law fraud claims. It said: "[A] party that makes an estimate based on certain facts impliedly represents that he knows of no other facts that would make the fulfillment of that projection impossible or improbable. . . ." *Id.* at 473. By providing an estimate of projected startup costs, the court reasoned, "the defendants thus also made a representation of a present fact—that they knew of no information that would make the projection in the UFOC improbable." *Id.*

Doctors Express seeks to distinguish *Motor City Bagels* on the ground that the UFOC in that case contained an express but inaccurate representation that the estimates were "'based on the latest available data.'"  *Id.* at 469 (quoting UFOC).  In contrast, the FDD here contains no such express assertion.  According to Doctors Express, it was under no duty to update its FDD any more frequently than annually,[21] and so plaintiffs cannot identify a duty of disclosure so as to support a claim for fraudulent concealment.  *See* DRX Reply at 7-8.

Doctors Express's argument is unconvincing.  The Maryland Franchise Law does not merely prohibit affirmative misrepresentations.  Rather, it also prohibits a franchisor's "omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading."  B.R. § 14-227(a)(1)(ii).  Moreover, with respect to fraudulent concealment, affirmative concealment of facts is actionable even in the absence of a duty to disclose.  This variety of fraudulent concealment includes a "situation where the defendant actively undertakes conduct or utters statements designed to, or that would, divert attention away from" a material fact.  *Lloyd*, *supra*, 397 Md. at 138 n.11, 916 A.2d at 274 n.11.  In other words, "the concealment or suppression [of a material fact] is in effect a representation that what is disclosed is the whole truth."  *Rhee*, *supra*, 182 Md. App. at 536, 958 A.2d at 396 (internal citation omitted).

*Walsh v. Edwards*, 233 Md. 552, 197 A.2d 424 (1964), provides a salient example.  In that case, the prospective purchaser of a home asked the seller about the depth of a nearby creek "and what it was likely to do 'during a storm.'"  *Id.* at 554, 197 A.2d at 425 (quoting record).  The seller allegedly responded that "'during a storm the creekbed sometimes filled up but that the water level went right down again within an hour or so' and that she did not think [the

---

[21] Doctors Express observes that it was required under the Maryland Franchise Law to submit a revised FDD or "prospectus" to the Commissioner on an annual basis in order to renew its registration.  *See* B.R. § 14-219.

- 35 -

purchaser] 'had anything to worry about,'" *id.* at 555-56, 197 A.2d at 426 (quoting record), but failed to disclose that the creek had in fact flooded the property on four previous occasions. While recognizing that "mere silence or nondisclosure of facts by the seller would not constitute actionable fraud," the Maryland Court of Appeals nevertheless held that, "where . . . the seller, in addition to not disclosing the facts, made an active misstatement of fact, or only a partial or fragmentary statement of fact, which misled the purchaser to his injury, the legal situation of the seller was reversed and there was imposed on her a duty to disclose all that she knew as to the probability of the creek overflowing." *Id.* at 557, 197 A.2d at 427.

In this case, Doctors Express was under no obligation to make a representation as to projected financial performance of a franchise in its FDD in the first place. *See* B.R. § 14-216(c)(20) (permitting, but not requiring, a franchisor to include in prospectus "a copy of *any* statement of estimated or projected franchisee earnings prepared for presentation to prospective franchisees") (emphasis added); *see also* 16 C.F.R. § 436.5(s) (provision of FTC's Franchise Rule permitting, but not requiring, disclosure of financial performance estimates). But, having decided to make such a representation, Doctors Express was required to make a representation that was supportable based on what it knew at the time it made the representation. *See* 16 C.F.R. § 436.5(s)(3) ("If the franchisor makes any financial performance representation to prospective franchisees, the franchisor must have a reasonable basis and written substantiation for the representation *at the time the representation is made . . . .*") (emphasis added). Indeed, the Franchise Rule expressly provides for a franchisor to "deliver to a prospective franchisee a supplemental financial performance representation about a particular location or variation, apart from the disclosure document." 16 C.F.R. § 436.5(s)(5). A disclosure that is knowingly inaccurate because it omits material information known to the franchisor may constitute a

violation of B.R. § 14-227(a)(1)(ii) or fraudulent concealment, even in the absence of a duty of disclosure arising from another source.

Doctors Express also contends that it never concealed the fact that the projections and estimates in the 2009 FDD were based on financial data from the years 2007-2008, and that, "by the time Plaintiffs were ready to sign the Agreement, they should have known that financial data from 2009 was going to be available in the near future."  DRX Reply at 9.  Doctors Express attempts to shift the burden of inquiry as to the accuracy of the financial projections to plaintiffs, arguing that they never requested the fiscal 2009 data from Doctors Express and "failed to postpone the Agreement's execution until after publication of the 2010 FDD."  *Id.* at 9-10. Perhaps this argument would convince a fact finder.  But, it does not undermine the legal sufficiency of plaintiffs' claims at the pleading stage.

In *A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*, 795 F. Supp. 2d 365 (D. Md. 2011), Judge Alexander Williams, Jr. held that the plaintiff stated claims under the Maryland Franchise Law and for common law fraud, where the plaintiffs alleged that the initial investment estimates contained in a franchisor's FDD "dramatically underestimated the actual startup costs for the franchise, and that [the franchisor] knew the representations were inaccurate at the time it made them." *Id.* at 375.  Judge Williams articulated

> some of the factors that courts ought to consider in discerning whether faulty projections are actionable as fraud: (1) the extent of the discrepancy between the projection and the actual amount of the projected item, (2) whether the projection is based on mere speculation or on concrete facts within the defendant's possession, and (3) whether the cost projection is contrary to any facts within the defendant's possession.

*Id.* at 376 (internal footnote omitted).

Here, plaintiffs have articulated significant discrepancies between Doctors Express's projections and the actual results realized by plaintiffs, and the projections were based on

concrete facts within Doctors Express's possession.  Plaintiffs have also plausibly alleged that the projections were contrary to other undisclosed facts within Doctors Express's possession at the time it made the statements at issue.  Accordingly, I reject Doctors Express's argument that its financial estimates and projections cannot form the basis of plaintiffs' claims in Counts I and II as a matter of law.

I turn to Doctors Express's second principal argument, which is that it was unreasonable as a matter of law for plaintiffs to rely on the financial projections and on alleged representations that were made by Doctors Express and its agents outside of the FDD (such as in emails, online marketing materials, the DRX Business Model, and oral statements).  This argument is based on several disclaimers that were contained in the FDD and the Franchise Agreement.[22]

The disclaimers at issue are as follows.  First, in Item 19 of the FDD, which constituted the "Financial Performance Representations," the FDD stated:

> **The information in this Item 19 should not be considered a representation or guaranty that you will or may achieve any level of revenue, sales or profits, or that you will experience the same or similar expenses or costs in the operation of your DRX Management Business or the PC's operation of the DRX Center.**
>
> You are strongly encouraged to consult with your own financial advisors in reviewing the tables and, in particular, in estimating your sales (and the revenue of the PC/DRX Center) as well as the categories and amounts of costs and expenses that are not included in the Baltimore Center table [*i.e.*, referring to the Towson DRX center] that you will or may incur in operating your own DRX Management Business.
>
> Actual costs, expenses and revenues vary from business to business, and from franchisee to franchisee. We cannot estimate the results of any specific business or franchisee. Results of a new franchisee's DRX Management Business are likely to differ from those of established DRX Centers.

---

[22] Doctors Express also relies on another disclaimer, contained in the "Franchisee Compliance Certification," that it has submitted as Exhibit C to the DRX Motion (ECF 13-2 at 103).  As noted, I am not considering the Franchisee Compliance Certification in connection with the DRX Motion.  Even if consideration were appropriate, however, my analysis of it would be the same as the analysis of the disclaimers contained in the 2009 FDD and the Franchise Agreement.

We recommend that you make your own independent investigation about your Franchised Business' potential financial performance, and that you consult with your attorney and other advisors before signing any Franchise Agreement.

Substantiation for the data set forth in the table will be made available by us to prospective franchisees upon reasonable request.

Other than the preceding financial performance representation, Doctors Express does not make any financial performance representations. We also do not authorize our employees or representatives to make any such representations either orally or in writing. If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet. If you receive any other financial performance information or projections of your future income, you should report it to the franchisor's management by contacting Peter Ross, our CEO at [address and phone number,] the Federal Trade Commission, and the appropriate state regulatory agencies.

FDD at 43 (emphasis in original).

Similarly, in connection with the estimated initial investment (Item 7 of the FDD), the

FDD stated, *inter alia*:

This is an estimate only for the additional operating capital needed to operate your Franchised Business during the initial 3 months after you open for business. We cannot guarantee that you will not have additional expenses starting the business. . . .

The expenses you incur during the start-up period will depend on factors such as local economic and market conditions, whether your Franchised Business is located in a new market or a mature market, your experience and business acumen, competition, and the sales level you reach during this initial period. . . .

. . . In compiling these estimates, we have relied on the experience and data collected from our affiliate that operates an urgent care center (in Maryland). Your costs will depend on a number of factors including local economic and market conditions.

The Franchise Agreement contained additional provisions that are pertinent.   Section

17.12 of the Franchise Agreement included an integration clause that stated, in part:

[T]his Agreement, and the exhibits and attachments hereto, constitutes [sic] the entire, full and complete agreement between the parties hereto, and supersede any and all prior or contemporaneous negotiations, discussions, understandings and agreements.   There are no other oral or written understandings or agreements between us and you, or oral representations by us, or written representations by us (other than those set forth in our Franchise Disclosure Document that we provided to you), relating to the subject matter of this Agreement, the franchise

- 39 -

relationship, or the Franchised Business (any understandings or agreements reached, or any representations made, before this Agreement are superseded by this Agreement).

In addition, Section 20 of the Franchise Agreement contained the following "Acknowledgments":

You acknowledge:

(a)     That you have independently investigated the Doctors Express Urgent Care Business franchise opportunity and recognize that, like any other business, the nature of the business [of] a Doctors Express Urgent Care Center may, and probably will, evolve and change over time.

(b)     That an investment in a Doctors Express Urgent Care Business involves business risks that could result in the loss of a significant portion or all of your investment.

*     *     *

(f)     That you have not received from us or any person or entity representing or claiming to represent us, and you are not relying upon, any representations or guarantees, express or implied, as to the potential volume, sales, income, or profits of a Doctors Express Urgent Care Business, and that any financial information that may appear in our Franchise Disclosure Document is not a representation or guarantee as to potential volume, sales, income, or profits that you may achieve at a Doctors Express Urgent Care Business.

*     *     *

(j)     That we have not made any representation, warranty, or other claim regarding this Doctors Express Urgent Care Business franchise opportunity, other than those made in this Agreement and our Franchise Disclosure Document, and that you have independently evaluated this opportunity, including by using your business professionals and advisors, and have relied solely upon those evaluations in deciding to enter into this Agreement.

As Doctors Express sees it, in the face of these disclaimers and acknowledgments, plaintiffs cannot establish the reasonableness of their reliance on the estimates and projections contained in the FDD or the representations contained in other communications that were not part of the FDD or Franchise Agreement. *See* DRX Motion at 10-11. According to Doctors Express, the "explicit terms of the Franchise Agreement . . . unambiguously establish that Plaintiffs specifically agreed that they did not rely on any statements or representations outside

the Agreement or FDD in deciding to acquire the franchise."  DRX Motion at 11.  Put another way, even if misrepresentations were made in the estimates and extraneous communications, the misrepresentations were not "material," because a "'material' fact is one on which a reasonable person would rely in making a decision."  *Sass*, *supra*, 152 Md. App. at 430, 832 A.2d at 260. Thus, in Doctors Express' view, "a reasonable person in [plaintiffs'] position would not have relied on representations outside the Franchise Agreement or FDD.  Stated differently, any representations that do not appear in the Franchise Agreement or FDD could not have constituted a material fact under Maryland law."  DRX Motion at 12.

Plaintiffs respond with two primary counterarguments.  First, they point out that several of the misrepresentations on which their claims are based allegedly were made after the Franchise Agreement was executed, during the period between execution of the agreement and the opening of the Des Peres DRX center, and thus could not possibly be precluded by the integration clause or the various disclaimers and acknowledgments in the Franchise Agreement and the FDD.  Doctors Express does not offer any response to this contention in its DRX Reply, and plaintiffs' argument has common-sense appeal.[23]

With respect to the alleged representations and omissions in communications made before the execution of the Franchise Agreement and in the FDD, plaintiffs respond that Doctors Express's argument is foreclosed by B.R. § 14-226.  As noted, that provision of the Maryland Franchise Law states: "As a condition of the sale of a franchise, a franchisor may not require a

---

[23]  It is not clear that a misrepresentation made after the Franchise Agreement was executed would come within the ambit of the private right of action under the Maryland Franchise Law, which applies by its terms to false statements and omissions made as a "means" to an "offer to sell or sell[ing]" of a franchise.  B.R. § 14-227(a)(1).  Arguably, a false statement or omission made after a franchise agreement was executed would not be actionable under the statute.  However, defendants have not challenged plaintiffs' claims on this basis, and so I need not address this point further at this juncture.  In any event, this point would not vitiate the plaintiffs' common law fraud claims as to such post-agreement misrepresentations or omissions.

prospective franchisee to agree to a release, assignment, novation, waiver, or estoppel that would relieve a person from liability under this subtitle."  I agree with plaintiffs that B.R. § 14-226 precludes Doctors Express's reliance on the disclaimers and integration clause to defeat liability, at least at the motion to dismiss stage.

To be sure, courts are divided as to whether such disclaimers and qualifications in FDDs and franchise agreements preclude reasonable reliance on a franchisor's representations.  Some courts hold that reliance in the face of such disclaimers is unreasonable as a matter of law.  *See, e.g.*, *Ellering v. Sellstate Realty Sys. Network*, 801 F. Supp. 2d 834, 844-45 (D. Minn. 2011). However, I find persuasive the views expressed in *Randall v. Lady of America Franchise Corp.*, 532 F. Supp. 2d 1071 (D. Minn. 2007), with respect to an anti-waiver provision of Minnesota's franchise statute that is quite similar to B.R. § 14-226.  The provision at issue in *Randall*, Section 80C.21 of the Minnesota Franchise Act, provided, *id*. at 1088:

> "Any condition, stipulation or provision, including any choice of law provision, purporting to bind any [covered franchisee] to waive compliance or which has the effect of waiving compliance with any provisions of [the Minnesota Franchise Act] or any rule or order thereunder is void."

The *Randall* Court illuminated why such a provision renders integration clauses and disclaimers as to extraneous representations unavailing to a franchisor.  It said, *id.* at 1088-89:

> [The legislative history] indicates that § 80C.21 is to be construed broadly, as does the fact that Minnesota courts have recognized repeatedly that the Minnesota Franchise Act is a remedial statute designed to favor franchisees.
>
> The plain language of § 80C.21 is consistent with the broad scope intended by the legislature and advocated by plaintiffs.  Section 80C.21 voids anything in a contract that explicitly waives compliance with a provision of the Act or that has the effect of waiving compliance with a provision of the Act.  One such provision that cannot be waived is [the] prohibition of material false statements.
>
> [The] scope [of the prohibition on material false statements] is clear.  The provision would, for example, prohibit a dishonest franchisor from telling a

franchisee that all existing franchise locations had gross annual sales of at least $1 million, when in fact no location had gross sales over $250,000.  And it is equally clear that, under § 80C.21, the dishonest franchisor could not avoid [the false statement] prohibition by including the following in the franchise agreement: "I may have misrepresented the revenues of existing franchises. You waive your right to hold me liable for those misrepresentations under . . . the Minnesota Franchise Act."  Such a provision would plainly be invalid under § 80C.21.

Under § 80C.21, any provision that has the same "effect" as this waiver would also be invalid.  Suppose, for example, that the dishonest franchisor included in the franchise agreement not the express waiver provision quoted in the preceding paragraph, but rather the following: "I did not make any representations about the revenues of existing franchises.  If you disagree, I hereby disclaim any representations that you believe I made.  You cannot rely on them."  Why should such a disclaimer, for purposes of Minnesota's franchise law, be treated any differently from the express waiver?  The disclaimer cannot change the historical facts; if the dishonest franchisor made misrepresentations, then he made misrepresentations, no matter what the franchise agreement says.  Thus, the disclaimer can only be an attempt to change the legal effect of those misrepresentations.  That is precisely what § 80C.21's anti-waiver language forbids.

Similarly, suppose that the dishonest franchisor included the following in the franchise agreement: "I did not make any representations about the revenues of existing franchises.  If you disagree, you must list such representations below. If you don't list a representation, you cannot later sue me for making that representation."  Again, the disclaimer cannot change the historical facts of what representations were made.  Rather, the disclaimer is attempting to change the legal effect of those representations.  Instead of telling the franchisee, "You waive your right to sue me for any misrepresentation when you sign this agreement," the franchisor tells the franchisee, "You waive your right to sue me for certain misrepresentations—those you fail to list before signing this agreement."  Such an assertion has "the effect of waiving compliance with" [the] prohibition of material false statements, and thus it is void under § 80C.21.

The Court recognizes that, under its broad interpretation of § 80C.21, franchisors cannot use contractual provisions to protect themselves from being sued for misrepresentation under the Minnesota Franchise Act.  Consequently, even scrupulously honest franchisors will have to defend against some misrepresentation claims that would not be brought—or that would be quickly dismissed—if contractual disclaimers were enforceable. But under the interpretation of § 80C.21 advocated by [the defendant franchisor]—that is, under a rule in which courts give effect to contractual disclaimers regardless of whether franchisors have actually made false statements of material facts—a certain number of franchisees who have been lied to will have no redress against dishonest franchisors.   The Minnesota legislature has decided to burden

franchisors, and protect franchisees, and this Court is bound to enforce that decision.

In this District, Judge Richard D. Bennett reached a similar conclusion with respect to B.R. § 14-226 in *Three M Enterprises, Inc. v. Texas D.A.R. Enterprises, Inc.*, *supra*, 368 F. Supp. 2d 450, albeit considering a type of waiver provision that is not entirely analogous to the disclaimers and integration clause at issue here.  In *Three M*, Judge Bennett held void a choice of law provision mandating application of Texas law, which was contained in a franchise agreement that, but for the choice of law provision, would be governed by the Maryland Franchise Law.  He reasoned that the choice of law provision "would have the effect of entirely depriving a plaintiff of a cause of action to which the plaintiff would otherwise be entitled," because Texas law, unlike Maryland law, did not contain a private right of action for "failure to fully disclose material information relating to [a] franchise."  *Id.* at 458-59.  "Thus, if enforced, the choice of law clause . . . would operate as precisely the type of waiver proscribed by the Maryland General Assembly in Section 14-226" of the Maryland Franchise Law.  *Id.* at 459.

In reaching his decision, Judge Bennett looked to B.R. § 14-202, the statement of purpose for the Maryland Franchise Law, which provides, *inter alia*, that the statute was enacted in response to "substantial losses" suffered by franchisees "when the franchisor or its representative has not given complete information," B.R. § 14-202(a)(2), and is intended to "give each prospective franchisee necessary information about any franchise offer" and to "prohibit the sale of franchises if the sale would lead to fraud or a likelihood that the franchisor's representations would not be fulfilled."  B.R. § 14-202(a)(3).  He concluded: "[G]iven the Maryland General Assembly's clear statement of intent, as evinced by Sections 14-202 and 14-226, it is clear that waivers and releases of a plaintiff's rights under the Maryland franchise laws are void as such clauses violate a fundamental public policy of the State."  *Three M*, 368 F. Supp. 2d at 459.

It follows that the integration clause and the disclaimers contained in the Franchise Agreement and the FDD are legally inoperative to bar plaintiffs' Maryland Franchise Law claims, to the extent that they would operate as a "release, . . . waiver, or estoppel," B.R. § 14-226, as to plaintiffs' claims of misrepresentations or omissions under B.R. § 14-227(a)(1)(ii). Nevertheless, the integration clause and waivers are not necessarily wholly irrelevant.

In a recent district court decision, *Long John Silver's, Inc. v. Nickleson*, ___ F. Supp. 2d ___, 2013 WL 557258 (W.D. Ky. Feb. 12, 2013), the court also followed *Randall* in holding that disclaimers of extraneous representations did not entitle a franchisor to dismissal of a franchisee's Minnesota franchise law claims as a matter of law.   But, the court said that a disclaimer "should suppress a franchisee's reliance on the purported misstatements," *id.*, 2013 WL 557258, at *7, and remarked: "The disclaimers will no doubt influence a jury's determination of whether [the franchisee's] reliance on the alleged untrue statements was reasonable." *Id.* at *9.  On the other hand, the court observed that "a franchisee aware of the . . . anti-waiver provision . . . may reasonably believe that a disclaimer would not be upheld in court." *Id.* at *7.  Thus, the court held that the franchisor "cannot use a disclaimer to defeat [the franchisee's] misrepresentation claim" under the franchise law, *id.* at 9, but that the disclaimer "presented a genuine issue as to reliance," a matter for resolution by the fact-finder.  *Id.* at *8.

I agree with the *Long John Silver's* Court.   Construed as waivers of plaintiffs' misrepresentation claims under the Maryland Fraud Law, the disclaimers are legally void.  But, the disclaimers remain factually relevant, and might be persuasive to a fact finder with respect to the materiality of the alleged misrepresentations and omissions and the reasonableness of plaintiffs' reliance on them.

Doctors Express's reliance on the disclaimers and integration clause is similarly misplaced with respect to plaintiff's common law fraud claim.  In *Pease v. Wachovia SBA Lending, Inc.*, 416 Md. 211, 246, 6 A.3d 867, 888 (2010), the Maryland Court of Appeals summarized the legal effect of an integration clause upon a claim of fraud:

> "[A] party to a contract cannot, by misrepresentation of a material fact, induce the other party to the contract to enter into it to his damage, and then protect himself from the legal effect of such misrepresentation by inserting in the contract a clause to the effect that he is not to be held liable for the misrepresentation which induced the other party to enter into the contract.  The effect of misrepresentation and fraud cannot be thus easily avoided.  If it could be, the implied covenant of good faith and fair dealing existing in every contract would cease to exist."

*Id.* at 246 n.11, 6 A.3d at 888 n.11 (quoting *Greenfield v. Heckenbach*, 144 Md. App. 108, 137, 797 A.2d 63, 80 (2002), quoting in turn *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 338 n.7, 439 A.2d 534, 539 n.7 (1982), quoting in turn *Jackson v. State*, 205 N.Y.S. 658, 661 (N.Y. App. Div. 1924), *aff'd*, 150 N.E. 556 (N.Y. 1925)).

Certainly, as with plaintiffs' statutory claim, the integration clause and disclaimers may remain factually relevant, even though they do not preclude the fraud claim as a matter of law. Although an integration clause does not "*bar*[ ] a claim of fraud based on pre-contractual representation in every instance," it can "defeat[ ]" a fraud claim "together with . . . evidence of the unreasonableness of [the plaintiff's] reliance, in combination with . . . other evidence."  *Cent. Truck Ctr., Inc. v. Cent. GMC, Inc.*, 194 Md. App. 375, 393, 4 A.3d 515, 525 (2010) (emphasis in original).  Yet, of import here, such a determination cannot be made at the pleading stage. Therefore, I reject the two principal arguments that Doctors Express asserts as to Counts I and II.

Doctors Express also raises three other issues that can be resolved more easily.  First, plaintiffs assert in Paragraphs 81-83 of the Complaint that Doctors Express violated the Maryland Franchise Law by seeking to impose a shorter limitations period than the Maryland

Franchise Law provides.  Under B.R. § 14-227(e), a claim under the Maryland Franchise Law's private right of action "must be brought within 3 years after the grant of the franchise."  In turn, COMAR § 02.02.08.16L(2) provides that it is a misrepresentation in violation of the Maryland Franchise Law for a "person authorizing, aiding in, or causing to be made, an offer or sale of a franchise" to require a franchisee to agree to a limitations period other than the statutory period.  Despite this requirement, Section 17.10 of the Franchise Agreement stated that actions arising out of the agreement must be brought within as little as one year "after the date upon which a party discovered, or should have discovered, the facts giving rise to an alleged claim." Accordingly, the Complaint alleges that Section 17.10 of the Franchise Agreement constituted a Maryland Franchise Law violation.

Doctors Express points out, however, that the Maryland Disclosure expressly modified Section 17 of the Franchise Agreement by adding the following language: "Any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise."  In their Opposition, plaintiffs do not dispute that the Maryland Disclosure nullifies the alleged violation.  Thus, I agree with Doctors Express that Count I must be dismissed to the extent that it alleges imposition of a limitations period contrary to B.R. § 14-227(e) and in violation of COMAR § 02.02.08.16L(2).

Second, the Complaint asserts that Doctors Express violated the Maryland Franchise Law and other regulations enacted by the Commissioner by attempting to condition the Hanleys' sale of the Des Peres DRX franchise to Doctors Express's Master Franchisor on the Hanleys' execution of a general release of Doctors Express from liability.  The Complaint points out that the franchisee's execution of such a release was ostensibly required by Section 12.3(h) of the Franchise Agreement, which provided, as a condition of any transfer of the franchise other than

the transfer of a non-controlling interest in the franchisee business entity, that the franchisee and its transferring owners must "sign a general release in a form satisfactory to [Doctors Express], of any and all claims against [Doctors Express] and [its] shareholders, officers, directors, employees, and agents."   According to Paragraphs 77-80 of the Complaint, this provision of the Franchise Agreement and Doctors Express's attempt to enforce it violated the statutory anti-waiver provision of B.R. § 14-226, as well as COMAR § 02.02.08.16L(1) and (3).   The regulations respectively prohibit requiring a franchisee to "[p]rovide a release from liability under the provisions of the Maryland Franchise Law as part of a franchise agreement or as a condition of the sale, renewal, or assignment of a franchise," COMAR § 02.02.08.16L(1), or to "[w]aive the franchisee's right to file a lawsuit alleging a cause of action arising under the Maryland Franchise Law in any court of competent jurisdiction in this State."

Doctors Express does not expressly challenge plaintiffs' claim that its waiver requirement violated the anti-waiver provisions of B.R. § 14-226 and COMAR § 02.02.08.16L(3).  However, Doctors Express argues that COMAR § 02.02.08.16L(1) applies only to a "sale, renewal, or assignment of a franchise" between the franchisor and the franchisee.   Therefore, Doctors Express reasons, the regulation does not pertain to the waiver requirement found in Section 12.3(h) of the Franchise Agreement, which Doctors Express views as applying only to a transfer of the franchise by the franchisee to a third party.   But, Doctors Express cites no authority for the proposition that COMAR § 02.02.08.16L(1) applies only to transfers between the franchisor and franchisee, and the text of the regulation does not suggest any such limitation.   In my view, the regulation is fully applicable to a transfer between a franchisee and a third party, and by its plain terms prohibits a provision in a franchise agreement such as Section 12.3(h).   Therefore, I will not dismiss this aspect of Count I.

Finally, Doctors Express argues that, to the extent that plaintiffs' claims are based on representations and omissions regarding the credentialing and insurance reimbursement contracting process, plaintiffs cannot recover because they "have previously admitted that any issues with credentialing and contracting resulted directly from the representations, actions and/or omissions of a third-party." DRX Motion at 19. The sole basis for this claim, however, is Exhibit E to the DRX Motion, an email from Mr. Hanley to Renee Lohman of the Lohman Group, which is not a proper subject of consideration under Fed. R. Civ. P. 12(b)(6), as already discussed.

Even if I could consider the email, it would not be sufficient to carry the day for Doctors Express. Doctors Express quotes Mr. Hanley as stating, in the email, that "all damages stemming from credentialing and contracting 'are linked exclusively to [the Lohman Group's] misconduct . . .'" DRX Motion at 20 (quoting email) (alteration in DRX Motion). Doctors Express claims that Mr. Hanley thereby "unmistakably admitted that any and all damages relating to credentialing and contracting are attributed to the Lohman Group—not to the Doctors Express Defendants." *Id.* Assuming that Doctors Express accurately quoted Mr. Hanley, the email would not have the conclusive effect that Doctors Express attributes to it. The alleged statement was made in an email from one private party to another. It was not a claim advanced in litigation, such as might support a finding of judicial estoppel. *See, e.g., Pa. Nat'l Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106, 117 (4th Cir. 2012) ("If a litigant 'assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.' This doctrine, known as judicial estoppel, 'generally prevents a party from prevailing in one phase of a case on an

argument and then relying on a contradictory argument to prevail in another phase.'") (internal citations omitted).  Nor was the alleged statement made under oath, such that a subsequent contrary averment might be stricken under the "sham affidavit rule."  *See, e.g.*, *Zimmerman v. Novartis Pharm. Corp.*, ___ F.R.D. ___, 2012 WL 5816873, at *5 (D. Md. Nov. 16, 2012) ("Under the sham affidavit doctrine, 'a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.'") (citation omitted).

At most, the statement is an admission by a party opponent, *see* Fed. R. Evid. 801(d)(2)(A), that is admissible in evidence but is subject to explanation or rebuttal.  And, there are obvious reasons that plaintiffs' claim against Doctors Express might not necessarily be inconsistent with Mr. Hanley's prior attribution of sole fault to the Lohman Group.  For instance, Mr. Hanley could have subsequently learned additional facts suggesting fault on the part of Doctors Express that he had not previously suspected.  Or, plaintiffs might have a viable claim that Doctors Express is vicariously liable for the Lohman Group's alleged misrepresentations.[24] Or, Mr. Hanley's statement could have been pure bluster—an insistence on the Lohman Group's sole responsibility in order to spur action to resolve his complaints, even though he knew that Doctors Express was also partly at fault.  Suffice it to say, even if the Court could consider Mr. Hanley's alleged statements in his email to Ms. Lohman, they do not foreclose plaintiffs' claims against Doctors Express as a matter of law.

---

[24] At this juncture, Doctors Express has not expressly asserted that it cannot be held liable for misrepresentations and omissions that, according to the Complaint, were made by the Lohman Group.  Therefore, I need not resolve any issue of vicarious liability.  Nor do I express any view as to the viability of a claim of vicarious liability.

In sum, except to the extent that the DRX Motion concerns plaintiffs' claims regarding the statute of limitations issue under COMAR § 02.02.08.16L(2), I will deny the DRX Motion as to Counts I and II of the Complaint.

### D.  Rhino Motion

Rhino's banner argument is that it cannot be liable to plaintiffs for violation of the Maryland Franchise Law or for fraud, because Rhino was merely a franchise broker.  Rhino's argument is primarily based on ordinary principles of agency.  Rhino summarizes its argument as follows, Rhino Motion at 4:

> The claim against Rhino . . . should be dismissed because the Hanleys do not allege that Rhino . . . did anything more than distribute to the Hanleys an FDD and other documents (prepared by others) related to DRX, and that they made a representation that was consistent with the information contained in those documents. These allegations are insufficient to state a claim against Rhino . . . .
>
> Accepting as true for the purposes of this motion, the Hanleys' allegation that Rhino . . . acted as the "agent of [Doctors Express] for the purposes of marketing [DRX] franchises" (see Complaint at ¶ 5), Rhino . . . , as [Doctors Express's] agent, was entitled to rely on the statements made by [Doctors Express], and other agents of [Doctors Express], in the documents Rhino … provided to the Hanleys.  Rhino . . . is not liable for alleged misrepresentations made by [Doctors Express] or other agents of [Doctors Express] in those documents, unless Rhino . . . knew or should have known of the misrepresentations.

In support of its contention, Rhino cites the RESTATEMENT (SECOND) OF AGENCY § 348, comment b, which states:

> An agent is not liable because of misrepresentations of the principal or of another agent unless he knows or should know of them. He is not affected by the knowledge of facts which the principal or another agent has which, if known to him, would cause his representations to be fraudulent. An agent who makes untrue statements based upon the information given to him by the principal is not liable because of the fact that the principal knew the information to be untrue. An agent can properly rely upon statements of the principal to the same extent as upon statements from any other reliable source.

In addition to common law agency principles, Rhino relies on statutory interpretation of the Maryland Franchise Law, and comparison of the Maryland statute's provisions with relevant provisions of the FTC's Franchise Rule.

As I will explain, I agree with Rhino that plaintiffs fail to state a claim against it for common law fraud, under Count II.  However, plaintiffs' statutory claim under the Maryland Franchise Law survives Rhino's motion.

As discussed, one of the elements of a cause of action for common law fraudulent misrepresentation is that the falsity of the defendant's representation "'was either known to the defendant or that the representation was made with reckless indifference as to its truth.'"  *Sass*, *supra*, 152 Md. App. at 429, 832 A.2d at 260 (citation omitted).  Another element is that "'the misrepresentation was made for the purpose of defrauding the plaintiff.'"  *Id.* (citation omitted).  Similarly, it is a required element of a cause of action for fraudulent concealment that "'the defendant intended to defraud or deceive the plaintiff,'" knowing that its omission was material. *Blondell*, *supra*, 413 Md. at 119, 991 A.2d at 94 (citation omitted).

Under common law agency principles, an agent is not liable for fraudulent representations of its principal that it conveys to a third party, unless the agent knows of the falsity of the representation.  These longstanding common law principles are well illustrated by the somewhat dated Maryland case of *State ex rel. Cavey v. Katcef*, 159 Md. 271, 150 A. 801 (1930).  In that case, a partnership was "engaged in the business of buying and selling horses." *Id.* at 273, 150 A. at 802.  "The partners owned a horse, which they knew 'had a propensity to be vicious, unruly, unmanageable, shy, and dangerous to drive,'" *id.* (quoting record), but they delivered the horse to their agent to sell.  The agent sold the horse to a third party, "upon the representation that the beast was gentle and easy and quiet to drive and was not shy." *Id.*  The

day after the purchaser bought the horse, it suddenly bolted, causing an accident that killed a child.  *See id.* at 274, 150 A. at 802.  In the tort suit that followed, both the partners and the agent were sued for fraud.  *Id.*

The Maryland Court of Appeals provided the following analysis, *id.* at 274-75, 150 A. at 802:

> The representation of the qualities of the horse was made by the [agent] . . . .  If the agent knew or believed the representation to be false, or if it undertook to state as a fact what the agent did not know was true or false, in order to make a sale, the agent was guilty of a fraud, and the agent . . . making the representation would be jointly liable with the principal because a material representation of a quality or condition of the thing sold with a knowledge of its falsity, or a reckless indifference to whether it is true or not, would make the . . . agent liable with his principal for the fraud.  If, however, the agent acted in good faith, and the fraud or deceit with respect to the quality of the horse was the principal's act alone, the principal and not the agent . . . making the representation would be liable to a third party; nor would the agent . . . be liable to a third party for mere neglect in not ascertaining by inquiry or trial the quality or condition of a horse in the agent's hands for sale.

Plaintiffs' Complaint does not allege any facts or circumstances suggesting that Rhino knew of the falsity of its alleged misrepresentations or knew of the materiality of its alleged omissions.  Rather, the allegations of the Complaint are entirely consistent with Rhino's role as a franchise broker, a mere conduit for information prepared by Doctors Express.  "A cause of action for fraud . . . has a strict requirement of scienter."  *First Union Nat'l Bank v. Steele Software Sys. Corp.*, 154 Md. App. 97, 147, 838 A.2d 404, 433 (2003), *cert. denied*, 380 Md. 619, 846 A.2d 402 (2004).

As noted, Rule 9(b) permits a general averment with respect to a defendant's state of mind.  Nevertheless, although "Rule 9(b) allows a plaintiff to plead elements of knowledge and intent 'generally'" in an action for fraud, "the allegations must still meet the ordinary plausibility standard required of all pleadings."  *Mayor & City Council of Baltimore v. Unisys Corp.*, Civ.

No. JKB-12-614, 2012 WL 3561850, at *5 (D. Md. Aug. 16, 2012) (citing *Mayfield v. National Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012)).  As to Rhino, the Complaint fails to articulate any facts that support the essential scienter element of the common law cause of action.   In effect, the "complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Iqbal*, *supra*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  Therefore, I will dismiss Count II with respect to Rhino, without prejudice.[25]

The same result does not obtain with respect to Count I, however.   Rhino takes the position that franchise brokers are simply outside the ambit of the Maryland Franchise Law.  Its interpretation is unsound.

Under the private right of action in B.R. § 14-227(a)(1), a franchisee may sue a "person who sells or grants a franchise."  Rhino contrasts this language with the definition of a "franchise seller" under the FTC's Franchise Rule.   Under the federal regulation, the term "[f]ranchise seller means a person that offers for sale, sells, *or arranges for the sale of* a franchise."  16 C.F.R. § 436.1(j) (emphasis added and omitted).  Moreover, the Franchise Rule expressly provides that the term includes a franchisor's "representatives, agents, . . . and third-party brokers who are involved in franchise sales activities."  *Id.*  As Rhino sees it, the Maryland statutory language of "sells or grants" is significantly narrower.   Rhino argues: "A franchise broker, such as Rhino [ ], may be involved in franchise sales activities, but it does not 'sell' or 'grant' franchises."  Rhino Motion at 6 n.3.

---

[25] Because Count II fails to state a claim against Rhino for this reason, I need not resolve Rhino's arguments that plaintiffs failed to allege other elements of their fraud claim with the requisite particularity.  If plaintiffs possess or acquire sufficient information to file an amended complaint restating Count II against Rhino with sufficient particularity, plaintiffs will be free to move for leave to file an amended complaint in accordance with Fed. R. Civ. P. 15(a)(2), Local Rule 103.6, and any subsequent scheduling order issued by the Court.

Perhaps the term "sells" in B.R. § 14-227(a)(1) could be susceptible of Rhino's narrow interpretation standing alone, but any such ambiguity evaporates when the statutory scheme is considered as a whole.   The term "franchisor" is specifically defined in the statute to mean "a person who *grants* a franchise."  B.R. § 14-201(h) (emphasis added).  If the Maryland legislature wanted to limit the scope of liability under B.R. § 14-227(a)(1) only to franchisors, it could have used the defined term "franchisor" in creating the cause of action, but it did not.  Instead, the scope of liability under B.R. § 14-227(a)(1) extends to any "*person who sells or* grants a franchise." (Emphasis added.)

Under Maryland's principles of statutory interpretation, a court must "give effect to each word so that no word, clause, sentence or phrase is rendered superfluous or nugatory."  *Foley v. K. Hovnanian at Kent Island, LLC*, 410 Md. 128, 152, 978 A.2d 222, 237 (2009).[26]  The word "sells" expands the scope of liability beyond the franchisor; any other interpretation would not make sense of the legislature's inclusion of both "sell[ing]" and "grant[ing]" a franchise as predicates for liability.  The legislature's intent to establish a broad scope of liability under the statute is further confirmed by the provisions for joint and several liability under B.R. § 14-227(d)(1), which make liable, *inter alia*, "each other person that has a similar status or *performs similar functions* as a person liable under [B.R. § 14-227]," B.R. § 14-227(d)(1)(iv) (emphasis added), and "each employee of a person liable under [B.R. § 14-227], if the employee *materially aids in the act or transaction* that is a violation under [the Maryland Franchise Law]."  B.R.

---

[26] When considering a question of state law while sitting in diversity, a federal court's obligation is to "predict how [the state's highest] court would rule if presented with the issue." *Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002). Accordingly, it is appropriate to apply the Maryland courts' principles of statutory interpretation to construe a Maryland statute.  In any event, federal law is no different.  *See, e.g.*, *Hosh v. Lucero*, 680 F.3d 375, 381, n.7 (4th Cir. 2012) (articulating "the canon of statutory interpretation that courts should 'give effect, if possible, to every clause and word of a statute'") (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883)).

§ 14-227(d)(1)(v) (emphasis added).  This language is sufficiently broad to include an agent who participates in making the sale of a franchise.  Rhino's interpretation is further undercut by the interpretive regulations promulgated by the Commissioner, which delineate and proscribe particular fraudulent and misleading activities when performed by any "person authorizing, aiding in, or causing to be made an offer or sale of a franchise."  COMAR § 02.02.08.16B – .16L.

The central premise of Rhino's argument is that, as a franchise broker, it lacked knowledge of the alleged falsity of the representations at issue.  But, the requirement of scienter is a key point on which the statutory cause of action for misrepresentations and omissions of material facts under the Maryland Franchise Law differs from the common law cause of action for fraud.  As discussed, a defendant's knowledge of the falsity of its representations (or reckless disregard for their truth) is an element of the plaintiff's cause of action for fraud at common law, for which the plaintiff bears the burden of proof.  But, under the Maryland Franchise Law, the burden is shifted: the defendant's *lack* of scienter is an affirmative defense.  B.R. § 14-227(a)(2) expressly states: "In determining liability under this subsection, the person who sells or grants a franchise has the burden of proving that the person who sells or grants a franchise did not know and, in the exercise of reasonable care, could not have known of the untruth or omission."

The plaintiff states a cause of action when it adequately alleges that

the person who sells or grants a franchise offers to sell or sells a franchise . . . by means of an untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, if the person who buys or is granted a franchise does not know of the untruth or omission.

B.R. § 14-227(a)(1)(ii).  Simply put, the falsity of the statement and the plaintiff's lack of knowledge that it is not true are elements of the statutory cause of action, but the defendant's

knowledge of the statement's falsity is not. Although liability "does not extend to a person who did not have knowledge of or reasonable grounds to believe in the existence of the facts by which the liability is alleged to exist," B.R. § 14-227(d)(2), it is the defendant's burden to prove that defense to liability.

The single case that Rhino cites in support of its position is not to the contrary. In *Salkeld v. V.R. Business Brokers*, 548 N.E.2d 1151 (Ill. App. 1989), the appellate court affirmed the grant of a directed verdict as to common law fraud claims against "business brokers" who participated in the sale of a franchise. *Id.* at 1159. The court said, *id.* (internal citations omitted):

> A review of the record indicates that these defendants were business brokers between [the franchisor's] corporations and plaintiff. Plaintiff's only contacts with these defendants included the initial meeting, which introduced plaintiff to the product, and the meeting at which time plaintiff signed the agreement. . . .
>
> We do not believe that [the] business brokers . . . had a duty to independently substantiate [the franchisor's] representations absent any facts indicating that the representations were untrue. These defendants had no reason to believe that [the franchisor's] representations were false, any more than plaintiff had any reason to believe they were false. Absent any duty or reason to investigate [the franchisor's] representations, we do not believe that these defendants should be held liable for [the franchisor's] misrepresentations.

But, that analysis, which is consistent with the result here as to the Hanleys' common law fraud claim against Rhino, was only directed to the common law fraud claims in *Salkeld*. *See id.* (stating that the brokers "contend that plaintiff failed to present a *prima facie* case of fraud as to them" and "[w]e agree"); *see also id.* at 1160 (stating that, as to the brokers, "we have . . . determined that plaintiff failed to state a *prima facie* case as to the common-law fraud counts").

Notably, the plaintiff in *Salkeld* had also brought a statutory cause of action under the Illinois Franchise Act. The trial court had entered judgment against plaintiff as to that count as well, but the appellate court "reversed and remanded *as to all defendants*," including the brokers.

*Id.* at 1160 (emphasis added).  The court remarked that the Illinois Franchise Act "was passed to remedy the perceived evil of nondisclosure in a franchise purchase and, as such, must be liberally construed to carry out legislative intent."  *Id.* at 1157.  It held that "plaintiff has presented a *prima facie* case" under the statutory cause of action.  *Id.*

In sum, plaintiffs have asserted a claim upon which relief can be granted against Rhino under Count I.  It may well be that Rhino will be able to demonstrate that it "did not know and, in the exercise of reasonable care, could not have known of the untruth[s] or omission[s]" alleged by plaintiffs.  B.R. § 14-227(a)(2).  But, this affirmative defense cannot be resolved by way of a Rule 12(b)(6) motion.  *See Goodman*, *supra*, 494 F.3d at 464 (stating that a Rule 12(b)(6) motion "generally cannot reach the merits of an affirmative defense" unless "facts sufficient to rule on an affirmative defense are alleged in the complaint").

## Conclusion

In sum, I will grant in part and deny in part both motions.  I will dismiss Count I only with respect to the issue of the limitations provision; otherwise, Count I remains viable as to all defendants.  Count II will be dismissed, without prejudice, as to Rhino, but not as to Doctors Express.  Count III will be dismissed, without prejudice, as to both defendants.  An Order implementing my rulings follows.

Date:   February 25, 2013             _____/s/_____
                                       Ellen Lipton Hollander
                                       United States District Judge